**DELBRUECK & CO., Plaintiff-Appellant,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY, Defendant-Appellee.**

No. 9, Docket 79–7123.

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 1979.

Decided Nov. 2, 1979.

---

Joseph D. Becker, New York City (Fox, Glynn & Melamed, John R. Horan, Kathleen M. Kundar, New York City, of counsel), for plaintiff-appellant.

Roy L. Reardon, New York City (Simpson, Thacher & Bartlett, Henry Landau, Nicholas M. Cannella, New York City, of counsel), for defendant-appellee.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

MOORE, Circuit Judge:

Delbrueck & Company ("Delbrueck") appeals from the dismissal of its complaint

after a bench trial held in the United States District Court for the Southern District of New York (Honorable Vincent L. Broderick, *District Judge*). The complaint charged Manufacturers Hanover Trust Company ("Manufacturers") with negligence and breach of contract in failing to revoke two transfers to the Chase Manhattan Bank ("Chase") for the account of Bankhaus I.D. Herstatt, K.G.a.A. ("Herstatt") totaling $12.5 million. The transfers were made via an electronic funds transfer system established by the New York Clearing House Association ("Clearing House") called the Clearing House Interbank Payments System and known as CHIPS.[1] Although the facts are more fully presented in Judge Broderick's opinion below (464 F.Supp. 989), a brief statement of those facts is necessary for this discussion of the appeal.

Delbrueck is a German banking house and performs functions as a commercial bank, a brokerage house and an investment bank. In connection with its banking business in 1974, Delbrueck was involved in buying and selling large quantities of foreign currency. Delbrueck maintained an account with Manufacturers, a New York banking corporation, and authorized Manufacturers to make payments out of the account. These authorizations consisted of telex messages which were customarily sent the day before the transfer was to be made.

Delbrueck had entered into three foreign exchange contracts with Herstatt which are of importance for this appeal: one for $2.5 million and one for $10 million, both due on June 26, 1974, and one for $10 million due on June 27, 1974. In accordance with the authorization procedure, Delbrueck sent a telex message to Manufacturers on June 25,

---

1. We reproduce in full Judge Broderick's discussion of the CHIPS system, 464 F.Supp. 989 at 992 n.5:

"The mechanics of effecting an interbank payment under the CHIPS system are as follows: When the paying or sending bank (Manufacturers) receives a telex from one of its customers (Delbrueck) instructing it to make a payment to a receiving bank (Chase), another member of the CHIPS system, for the account of one of the receiving bank's customers (Herstatt), the paying bank (Manufacturers) first tests and verifies the telex. Thereafter, the tested and verified telex is sent to one of the CHIPS computer terminal operators and the payment order contained in the telex is programmed into the terminal by typing into the computer the relevant information—*i. e.*, the identifying codes for the party originating the transfer (Delbrueck), the remitting bank (Manufacturers), the receiving bank (Chase), the party for whom the receiving bank is receiving the transfer (Herstatt) and the amount of the transfer ($10 million and $2.5 million). This information is then transmitted to the central computer located at the Clearing House, which, based upon the identifying codes searches out all the necessary clerical information, stores the message and causes a sending form to be automatically typed at the sending bank. In this case, this step was effected on June 25, 1974.

Once the programming of the computer has been completed, the send form is sent to the appropriate area at the sending bank for approval. When a determination is made at the sending bank (Manufacturers) to make the payment, the form is returned to one of the computer terminal operators, reinserted in the computer and the release key is depressed. At that moment, the central computer at the Clearing House causes a credit ticket to be printed automatically at the terminal of the receiving bank (Chase) and a debit ticket to be printed at the terminal of the sending bank (Manufacturers). Further, the central computer automatically makes a permanent record of the transaction and debits the Clearing House account of the sending bank and credits the Clearing House account of the receiving bank. In this case, this step was effected at 11:36 and 11:37 for the $10 million and $2.5 million payment, respectively, from Manufacturers for Delbrueck to Chase for Herstatt.

The funds received by a receiving bank (e. g., Chase) for the account of one of its customers (e. g., Herstatt) via the receipt of a CHIPS credit message are made available to the customer and can be drawn upon by the customer in the discharge of its obligations that same day, as soon as the receiving bank is aware of the fact that the funds have been received. This running tabulation by the receiving bank is generally referred to as a 'shadow balance.'

At the end of the day, the central computer correlates all of the day's transactions, nets out the debits and credits, and prints out reports showing which banks owe money and which have money due them. That information is delivered to the New York Federal Reserve Bank the next business day and adjustments are made on the appropriate books of account."

1974 ordering Manufacturers to transfer, on June 26, a total of $12.5 million to Chase for the account of Herstatt. In addition, early on the morning of June 26, Delbrueck authorized the payment of the $10 million due on June 27.

Then the problems began. Herstatt was closed by the German banking authorities around 10:30 a. m. (all times referred to are Eastern Standard Time) on June 26. Chase heard of the closing and immediately froze payments out of Herstatt's account but continued to accept incoming transfers. Delbrueck sent a telex message to Manufacturers at 11:30 a. m. requesting that the $10 million transfer to be made on June 27 be stopped. On June 26 Manufacturers transferred to Chase via the CHIPS system the payments which had been ordered to be made that day, namely, $10 million transferred at 11:36 a. m. and $2.5 million at 11:37 a. m. Delbrueck called Manufacturers at around 12:00 noon and later sent a telex message, trying to stop or recall the $12.5 million in payments which had already been made. That afternoon phone calls were made to Chase by Manufacturers and Delbrueck. These calls were directed at having the funds returned, but were unsuccessful. At around 9:00 p. m. the evening of June 26, Chase formally credited Herstatt's account with the $12.5 million.

Delbrueck maintains that the transfers were revokable until 9:00 p. m. and that by failing to revoke the transfers, Manufacturers was negligent and had breached its implied creditor-depositor contract with Delbrueck. *Stella Flour & Feed Corp. v. National City Bank*, 285 A.D. 182, 136 N.Y.S.2d 139, 142–43 (1st Dept. 1954), *aff'd*, 308 N.Y. 1023, 127 N.E.2d 864 (1955). Thus, the crucial issue on this appeal is whether the transfers of funds via CHIPS at 11:36 and 11:37 a. m. were final.[2] We hold those transfers were irrevocable and affirm the dismissal of the complaint.

First, the form of the transactions and the manner in which the banks viewed the transactions lead to the conclusion that the 11:36 and 11:37 a. m. transfers were final. The CHIPS system was specifically created to replace cashier's checks as a means of interbank payments of large amounts. As is stated in the CHIPS manual, "CHIPS completely eliminates checks for interbank payment transfers". (App. 377). It is not disputed that cashier's checks are irrevocable when transferred to the payee bank.

In addition, the Clearing House changed its rules after the Herstatt failure to allow revocation of transfers. Although the Clearing House previously had no specific rule concerning the finality of CHIPS transfers, all member banks must have believed that once transfers were released, they were final, except for adjustments made for clerical errors. Delbrueck's conduct supports this fact, because it initially requested stop payment only on the $10 million to be paid on June 27, apparently believing that the June 26 transfers had been made and were irrevocable.

As a direct result of the Herstatt failure, this new procedure was announced on July 1, 1974. The change was necessitated by a backlog in releasing orders created by uncertainties in the financial markets due to the Herstatt failure. Orders were not being released until the transferor was certain that funds were available to cover the transfer. The new procedure outlined in the July 1 announcement allowed members

2. Liability for alleged failure to revoke the $12.5 million credit transfers was essentially dependent upon the answer to the question posed by Delbrueck (Delbrueck Br., p. 11) "That issue [breach of contract] inescapably requires consideration of the question, when did the credit transfers to Herstatt become irrevocable?"

The breach of contract issue is characterized by Delbrueck as "the central issue on this appeal". Manufacturers' alleged failure to revoke was "in breach of contract [because it] did not

do so". Delbrueck concedes that: "If the credit transfers were irrevocable this appeal must fail, for the contract between Manufacturers and Delbrueck requires that any stop order issued by Delbrueck be received by Manufacturers at a time when Manufacturers still had power to revoke the transfers". (Delbrueck Br., p. 3).

We address the issues 1 and 2 presented for review by Delbrueck and refer to Judge Broderick's opinion, which we endorse, as to the other issues stated. (Delbrueck Br., pp. 1, 2).

to release payments but still have a right to recall them until 10:00 a. m. of the morning after the transfer. The change would not have been required if the transfers were considered revocable by member banks. And subsequently, on November 4, 1974, the CHIPS system reverted to the tacitly accepted procedure used before July 1, which was that the transfers were irrevocable.

The fact that final settling of the accounts was not done until 9:00 p. m. is irrelevant. That was a mere bookkeeping entry. As Manufacturers asserts, a cash payment or a cashier's check would not have been formally entered on Chase's books until 9:00 p. m. and even Delbrueck agrees that cash or a cashier's check would be irrevocable when transferred.

 The practices associated with banking transactions can be conclusive evidence of the legal effect of those transactions. *Indianapolis Morris Plan Corp. v. Karlen*, 28 N.Y.2d 30, 36, 319 N.Y.S.2d 831, 268 N.E.2d 632 (1971); *Hanlon v. Union Bank of Medina*, 247 N.Y. 389, 391, 160 N.E. 650 (1928). Based on the nature of the CHIPS system, and the fact that the member banks viewed the transactions as irrevocable (as evidenced by the short term change instituted after the Herstatt failure) we hold that the CHIPS transfers were irrevocable when made.

 The Uniform Commercial Code ("UCC") is not applicable to this case because the UCC does not specifically address the problems of electronic funds transfer. However, analogous use of concepts such as the finality of checks once "accepted" (§§ 3–410, 4–303) would support the irrevocability of these transfers.

 The common law supports the view that these transfers were irrevocable. Delbrueck's deposits with Manufacturers were choses in action and as such were assignable. *Miller v. Wells Fargo Bank International Corp.*, 406 F.Supp. 452 (S.D.N.Y. 1975), *affirmed*, 540 F.2d 548 (2d Cir. 1976); *Paragon International, N. V. v. Standard Plastics, Inc.*, 353 F.Supp. 88, 93 (S.D.N.Y.

1973). In order for there to be a valid assignment of a chose in action, there must be a specific direction to transfer by the assignor and notice to the assignee. As the *Miller* court stated:

"In sum, an assignment requires an agreement whereby the assignor agrees to transfer presently all right, title and control over the subject matter of the assignment to the assignee. Such an agreement may be manifested by conduct, writing or parol, and in particular it exists where the assignor instructs his obligor to pay the specific fund owing to him to the assignee, and the assignor either delivers that order to the assignee or notifies him of it." *Miller, supra*, 406 F.Supp. 452 at 474.

The required notice to the assignee may also be given by the obligor.

"An order by the creditor [Delbrueck] given directly to the debtor [Manufacturers] requesting him to pay a third person [Chase or Herstatt] does not in the absence of notice to that person make him an assignee of the claim." 3 Williston, *Contracts* § 406 at 156 (3d ed. 1960). *See also Schreiber v. Keller Engraving Co.*, 57 Misc. 644, 108 N.Y.S. 658 (Sup.Ct.1908).

 Delbrueck had given Manufacturers a clear direction to transfer these funds in its telex message of June 25. However, Delbrueck argues that the transfers were revocable until the necessary notice was given to the assignee. But notice was given in this case before Delbrueck sought to revoke the transfer.

Chase was the assignee. Delbrueck's direction in the telex message was to pay

　To CHASE BANK N Y
　　ACCT BANKHAUS ID HERSTATT
　　KGAA
　　(App. 358).

When Manufacturers transferred the money to Chase, Chase received a written credit slip at its computer terminal. That was notice to Chase of the assignment.

 Even if one assumes that Herstatt, not Chase, was the assignee, notice to Chase will be imputed to Herstatt. Chase was the

paying and receiving agent of Herstatt, and notice to an agent is imputed to the principal. *Farr v. Newman*, 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964). *See also Nolan v. Williamson Music, Inc.*, 300 F.Supp. 1311, 1316 (S.D.N.Y.1960); *Ford v. Grand Union Co.*, 268 N.Y. 243, 252, 197 N.E. 266 (1935).

Delbrueck's argument that Chase was not Herstatt's agent after the declared bankruptcy will not stand. Herstatt had directed Chase to "take whatever action [Chase] felt advisable as a result of this information [i. e. the closing of Herstatt]." (App. 68). Thus, Chase's freezing of payments out of Herstatt's account was only Chase continuing to act within the scope of its agency relationship with Herstatt.

Furthermore, the Restatement (Second) of Agency states:

"The bankruptcy . . . of the principal, of which the agent has notice, terminates his authority as to transactions which he should infer the principal no longer consents to have conducted for him." (§ 114).

Thus, where an agent has a specific contract which is vitiated by the principal's bankruptcy, the agency is terminated. *Lewis Sagal & Co. v. Smith*, 35 F.2d 182, 183 (3d Cir. 1929). However, Chase (the agent) could infer in this case that Herstatt (the principal) would consent to Chase gathering payments for Herstatt's account. Indeed, no inference is required because Herstatt specifically requested Chase to "take whatever action . . . advisable". Chase's authority to act as agent for Herstatt in receiving funds was not terminated by the bankruptcy.

*Sokoloff v. National City Bank*, 250 N.Y. 69, 164 N.E. 745 (1928) is inapposite to this situation. That case dealt with whether or not an intermediary bank can be agent for both the transferor and the transferee. Here, Chase is agent for Herstatt and Manufacturers is agent for Delbrueck. Chase's knowledge of the transfers is imputed to Herstatt, and the assignment was effective.

The other points raised by Delbrueck on appeal were adequately addressed in the well-considered opinion of the court below. We are in agreement with that decision in all respects and hold that the CHIPS payments from Manufacturers to Chase were irrevocable at 11:36 and 11:37 a. m., the times of the transfers.

The dismissal of the complaint is affirmed.