**William Vincent WALKER, Trustee in Bankruptcy for Minro Oil, Inc.**

v.

**TEXAS COMMERCE BANK, N.A.**

**C.A. No. H–83–5699.**

United States District Court,
S.D. Texas,
Houston Division.

May 22, 1986.

Mary Lou Andrews and Daniel H. Johnston, Ross, Banks, Houston, Tex., for plaintiff.

Eric Taube, Liddell, Sapp & Zivley, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

### Introduction

The characters in this unhappy tale form a sort of eternal triangle in bankruptcy. At one point is Plaintiff, Trustee in Bankruptcy for Minro Oil, Inc. ("Minro"), who alleges that Defendant breached an implied contract of deposit, and acted negligently in a wire transfer transaction. Defendant, Texas Commerce Bank-Austin, N.A. ("T.C. B."), appears at the second point, as the "deep pocket" from which the creditors of Minro hope to recover. Independent Trading Corporation ("I.T.C."), the recipient of a windfall in the sum of Twenty-Five Thousand Dollars ($25,000.00), would be at the third point, but fails to complete the design since the corporation is insolvent, another fatality in the seemingly endless recent stream of energy-related bankruptcies.

On March 25 and 26, 1986, the above-referenced cause of action was tried to the Court presiding without a jury. Having heard the testimony and reviewed the documentary evidence, this Court determines that Plaintiff is entitled to recover from T.C.B. in the sum of Twenty-Five Thousand Dollars ($25,000.00), and hereby enters the following Findings of Fact and Conclusions of Law.

### I. Findings of Fact

1. Minro was a corporation involved in the oil trading business in the State of Texas for a period of approximately one year, until placed in involuntary bankruptcy on October 17, 1980. Shortly thereafter, William Vincent Walker was appointed as the Trustee of Minro's estate. (Testimony of Walker).

2. T.C.B. is a national banking association doing business in Houston, Texas, which maintained Minro's principal bank account during the corporation's brief existence. (Testimony of Walker; Thompson).

3. Minro customarily settled accounts with its trading partners on the 20th of every month in the form of wire transfers initiated by T.C.B. upon oral instructions from a representative of Minro. (Testimony of Walker; Thompson; Jones).

4. On or about August 20, 1980, Linda Thompson, Minro's bookkeeper, instructed T.C.B. by telephone to wire transfer the sum of Two Million Two Hundred and Twenty-Five Thousand Dollars ($2,225,-000.00) to Minro's trading partner, I.T.C. Instead, T.C.B. transferred the sum of Two Million Two Hundred and Fifty Thousand Dollars ($2,250,000.00). (Testimony of Thompson; Plaintiff's Exhibits 1, 2, 3).

5. Prior to contacting T.C.B., Thompson prepared an internal check request form with the amount of Two Million Two Hundred and Twenty-Five Thousand Dollars ($2,225,000.00) pencilled in on the form. (Testimony of Thompson; Plaintiff's Exhibit 3).

6. T.C.B. notified Minro of the actual amount transferred by sending a debit advice dated August 25, 1980. (Testimony of Thompson; Plaintiff's Exhibit 2).

7. T.C.B. received confirmation in writing from Minro, which was also dated August 25, 1980, whereby Thompson confirmed her oral instructions to T.C.B. to wire transfer the sum of Two Million Two Hundred and Twenty-Five Thousand Dollars ($2,225,000.00). (Testimony of Thompson; Plaintiff's Exhibit 1).

8. Pursuant to custom in Thompson's office, the original of Plaintiff's Exhibit No. 1 was signed, properly addressed, stamped, and deposited in the mail for delivery. (Testimony of Thompson). Although Defendant objects to the admissibility of Plaintiff's Exhibit No. 1, the presumption of receipt is supported by T.C. B.'s own procedures. T.C.B. required customers who placed an oral transfer request to promptly confirm the request in writing. According to the usual custom and practice established by Defendant, the failure to promptly confirm an oral transfer request in writing entailed a follow-up by T.C.B. until receipt of the written confirmation. (Testimony of Thompson; Jones; Seat).

9. Upon receiving the debit advice from T.C.B. (Plaintiff's Exhibit 2), indicating that T.C.B. had wire transferred Twenty-Five Thousand Dollars ($25,000.00) more than requested, Thompson amended her transfer request form by erasing Plaintiff's Exhibit No. 3, and inserting the amount actually transferred, in order to balance Minro's daily cash ledger. (Testimony of Thompson; Volk).

10. On the same day that the debit advice was received, Thompson notified T.C.B. by telephone of the error that had been committed in the wire transfer to I.T.C., and was informed that T.C.B. would conduct an inquiry. Appropriate weight is accorded to Thompson's testimony regarding notice of the error to T.C.B., since it is essentially uncontroverted. T.C.B.'s representatives have no personal recollection regarding the notice of overpayment. Minro did not provide notice of the error in writing, and neither party made any further attempts to correct the error prior to the filing of the instant lawsuit. (Testimony of Thompson; Jones; Seat).

11. The first bank statement following the transfer to I.T.C. was dated September 29, 1980 (Defendant's Exhibit 5). However, Thompson, as well as Minro's other remaining employees, ceased employment during the first week of October. (Testimony of Thompson).

12. According to the procedures established by T.C.B. for initiating an oral wire transfer, an authorized representative of the transferring customer, who was recognized by telephone voice and account number, placed a call to a secretary in the Petrochemical Division at T.C.B., who then typed the request and delivered it to the bank's wire transfer department for transmittal. The amount of the request was

confirmed over the telephone by both parties, and later in writing. T.C.B.'s wire transfer department transmitted the instructions, placed the transfer, and prepared a debit advice. (Plaintiff's Exhibit 2). However, the customer's written confirmation was checked against the secretary's typed request, rather than against the wire transfer department's actual debit. T.C.B.'s secretaries customarily retained informal records for a brief period for the purpose of comparing the written confirmation against the oral transfer request. (Testimony of Jones; Seat).

13. An error committed by the wire transfer department could have gone undetected if it appeared that the secretary who had accepted the original request and the customer had not committed an error. Thus, the detection of errors in an oral transfer transaction essentially depended upon the diligence of the depositor in checking bank statements, the receipt of notice from third parties who received inaccurate payments, and the informal procedures implemented by the Petrochemical Division. (Testimony of Jones; Seat).

14. After being appointed trustee in bankruptcy, Walker employed Vi Volk to conduct an audit of Minro's books and records for the purpose of locating discrepancies, and identifying potential causes of action to be pursued on behalf of Minro's creditors. (Testimony of Walker; Volk).

15. Subsequent to Volk's discovery of the overpayment to I.T.C., Plaintiff notified T.C.B. of the relevant discrepancy on June 18, 1982 (Defendant's Exhibit 9). By that time, I.T.C. was insolvent. However, I.T.C. had retained sufficient funds in its account to cover the Twenty-Five Thousand Dollar ($25,000.00) overpayment for a period of more than seven months following the initial transaction. (Testimony of Walker; Volk; Jones).

16. Although Defendant has suggested plausible theories, it is unable to premise an adequate explanation upon documentary evidence sufficient to controvert Plaintiff's allegations of an erroneous payment to I.T.C. With the exception of routine checking account statements (Defendant's Exhibits 5, 6), Defendant generally relies upon the same documentary evidence introduced by Plaintiff. (Defendant's Exhibits 2, 3, 8). Furthermore, T.C.B.'s representatives have no personal recollection of the transfer in question. (Testimony of Jones; Seat).

## II. *Conclusions of Law*

1. The question before the Court—one of first impression in this district—is whether the rights and liabilities of the parties to a wire transfer transaction are governed by Article 4 of the Uniform Commercial Code, Tex. [Bus. & Com.] Code Ann. § 4.101 *et seq.* ("U.C.C."). Although Minro maintained an account with T.C.B., and must be considered a customer of T.C.B. within the meaning of the U.C.C., *see* § 4.104(a)(1) and § 4.104(a)(5),[1] for the purposes of this case, this Court shall assume, as the Second and Seventh Circuits have previously held in analagous circumstances, *see Delbrueck & Co. v. Manufacturers Hanover Co.,* 609 F.2d 1047 (2d Cir.1979) (electronic transfer of funds), and *Evra Corp. v. Swiss Bank Corp.,* 673 F.2d 951 (7th Cir.1982) (wire transfer transaction), that Article 4 is inapplicable, and will instead apply common law principles. Perhaps, the language of Article 4 could be stretched to encompass wire transfers, but such application was not within the contemplation of the draftsmen. Article 4 does not govern the transaction at issue because it does not specifically address the problems involved. Nevertheless, the affirmative defense asserted by the bank pursuant to U.C.C. § 4.406 will be considered, since the result would be the same in this case if

---

1. U.C.C. § 4.104(a)(1)(5) defines "account" and "customer" as follows:

§ 4.104. **Definitions and Index of Definitions**
(a) In this chapter unless the context otherwise requires

(1) "Account" means any account with a bank and includes a checking, time, interest or savings account;
(5) "Customer" means any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank;

the provisions of Article 4 were deemed to apply to an oral transfer request.

■ 2. The relationship between a bank and its depositor, whether derived from common law principles or premised upon Article 4 of the U.C.C., is in the nature of an implied contract. *See, e.g., LaSara Grain Co. v. First National Bank of Mercedes,* 673 S.W.2d 558, 564 (Tex. 1984); *Mesquite State Bank v. Professional Investment Co.,* 488 S.W.2d 73, 75 (Tex. 1973), and *City National Bank of Bryan v. Gustavus,* 130 Tex. 83, 106 S.W.2d 262 (1937). "When a customer deposits funds with a bank, the bank impliedly agrees to disburse those funds only in accordance with the depositor's instructions." *LaSara Grain Co.,* 673 S.W.2d at 564. Thus, T.C.B. breached its implied contract with Minro when it transferred Twenty-Five Thousand Dollars more than was requested, in contravention of the depositor's instructions.

■ 3. To the extent that prior law conflicts with the provisions of the U.C.C., it is supplanted by the Code. *See, e.g., Pacific Products, Inc. v. Great Western Plywood, Ltd.,* 528 S.W.2d 286, 291 (Tex.Civ.App.—Fort Worth 1975, no writ), *citing, Fredonia Broadcasting Corp., Inc. v. RCA Corporation,* 481 F.2d 781 (5th Cir.1973). Prior law is applicable, however, in so far as it has not been displaced by specific provisions of the U.C.C. *See* U.C.C. § 1.103.[2] Since there is no repugnancy between the U.C.C. and the application of Texas negligence principles in the instant case, Plaintiff is not barred from asserting a cause of action in tort. Indeed, other courts have applied negligence principles in defining the rights and liabilities of parties involved in similar transactions.

In *Securities Fund Services, Inc. v. American National Bank and Trust Company of Chicago,* 542 F.Supp. 323 (N.D.Ill.1982), for example, the district court, relying on *Evra Corp.,* 673 F.2d at 959, applied state negligence principles to reach the conclusion that the defendant-bank owed the plaintiff a duty to transmit a wire transfer in an accurate and timely manner, and that the bank had breached its duty of reasonable care. *Id.* at 326–27. Moreover, the statement of a claim in negligence is consistent with the explicit language of various provisions of the U.C.C. In sum, it is the duty of a bank to exercise good faith and use ordinary care in handling the accounts of its depositors. While the U.C.C., as adopted in Texas, does not expressly state that a bank may be held liable for negligent payment of an instrument, much less speak to the negligent processing of a wire transfer transaction, numerous provisions of the U.C.C. incorporate common law principles of negligence, and indirectly support Plaintiff's position. *See, e.g.,* U.C.C. § 3.419; § 4.202; § 4.203, and § 4.406. Thus, the general proposition that a bank owes a duty of reasonable care to its customers enjoys unwavering support which originates in decisional law both before and after the enactment of the U.C.C. *See Bullitt County Bank v. Publishers Printing Co., Inc.,* 684 S.W.2d 289 (Ky.Ct.App.1984).

■ Applying these general principles to the case at bar leads to the inescapable conclusion that a depositor may justifiably expect a bank to implement commercially reasonable internal procedures designed to process an oral transfer request in accordance with depositor's instructions, to verify the accuracy of, and compliance with, instructions, to detect and minimize inaccuracy, and to act promptly and diligently to remedy errors. There can be little doubt with regard to these justified expectations, given the procedures implemented by the bank, that T.C.B. has breached its duty to Minro to exercise reasonable care under

---

**2.** U.C.C. § 1.103 provides as follows:

**§ 1.103. Supplementary General Principles of Law Applicable**

Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

the circumstances, which duty derives from the implied contract of deposit that existed between the parties.

4. The parties vigorously dispute the assignment of the burden of proof. In reliance upon *Mesquite State Bank*, 488 S.W.2d at 73, and the citation of authorities therein, Plaintiff contends that Defendant must be assigned the burden of proving that it transferred funds in accordance with Minro's instructions. "In suits against a bank to recover deposits, the burden of proving payment under authority from the depositor is on the bank." *Id.* at 75. Defendant, of course, argues that Plaintiff must be assigned the traditional burden of proof. Although fuel for esoteric debate, the parties' argumentation is immaterial because Plaintiff has established by a preponderance of the evidence that T.C.B. both breached its implied contract of deposit, and failed to exercise ordinary care. Accordingly, the question of whether the bank should properly be assigned the burden of proof need not be reached in this case.

5. Without citing a single relevant authority, Defendant contends that the *Texas Civil Practice & Remedies Code* § 33.001 precludes a recovery from the bank since it alleges that Plaintiff's contributory negligence was more than fifty percent (50%) responsible for the loss of funds. Defendant's position on this point conflicts with U.C.C. § 4.103[3] which unequivocally stands for the proposition that the U.C.C. prevents a bank from contracting away its obligation to exercise ordinary care in the handling of a depositor's funds.

Plaintiff's more forceful argument, premised upon *Bullitt County Bank*, 684 S.W.2d at 293–94, and *Bank of Southern Maryland v. Robertson's Crab House, Inc.*, 39 Md.App. 707, 389 A.2d 388 (1978), is that a bank may not invoke the doctrine of equitable estoppel against a depositor if its own practices are commercially unreasonable, or if it has failed to exercise ordinary care. Thus, the plaintiff-depositor's failure to examine bank statements for a period of eleven months in *Bank of Southern Maryland, Id.*, 389 A.2d at 397–98, did not preclude recovery upon a negligence theory against the bank.

6. The Plaintiff herein, trustee in bankruptcy, is the representative of Minro's estate, and possesses capacity to sue and be sued. 11 U.S.C. § 323(a)(b). The trustee's statutory duties include investigating the financial affairs of the debtor, and collecting and reducing to money the property of the estate. 11 U.S.C. § 704. It might be anticipated that the reasonably prudent depositor would diligently check account statements, provide notice of an error in writing, and engage in a dogged pursuit of an erroneous transfer. Bankruptcy, however, does not follow the ordinary course of events. There simply were no employees remaining at Minro to provide more sufficient notice to T.C.B. of the erroneous payment to I.T.C. It is precisely due to such hiatus that the filing of a bankruptcy petition expressly tolls applicable statutes of limitations in order to provide an opportunity for the trustee to become familiar with the operation of the bankrupt's business. 11 U.S.C. § 108(a).[4]

---

3. U.C.C. § 4.103 provides in relevant part as follows:

**§ 4.103. Variation by Agreement; Measure of Damages; Certain Action Constituting Ordinary Care**

(a) The effect of the provisions of this chapter may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

4. Whereas subsection (a) of 11 U.S.C. § 108 extends the applicable period for commencing an action, Defendant contends that subsection (b) does not extend the applicable notice period provided for by the U.C.C. 11 U.S.C. § 108(a) provides as follows:

**§ 108. Extension of time**

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

This Court concludes that Minro's trustee has exercised reasonable diligence in prosecuting the instant cause of action, which was timely filed pursuant to 11 U.S.C. § 108(a).

■ 7. Finally, the bank asserts U.C.C. § 4.406 as a defense to liability. This Court concludes, however, that a wire transfer is not an "item paid in good faith" within the meaning of section 4.406, and that the statutory language with reference to "unauthorized signature[s]" and "alternation[s]" should not be construed to include the type of error committed by T.C.B. in this wire transfer transaction.

■ 8. Moreover, there are three reasons why section 4.406 would not benefit Defendant if Article 4 controlled the disposition of this case. First, Defendant contends that the U.C.C. imposes a one year notice period upon Minro, which is not extended by 11 U.S.C. § 108(b),[5] and which required Minro to report the overpayment to T.C.B. by August 25, 1981. *See* U.C.C.

§ 4.406(d).[6] However, Thompson's telephone notice of the erroneous payment to I.T.C. complies with the literal requirements of subsection (d). Such notice was timely, reasonable under the circumstances, and accrues to the benefit of Minro's estate. Second, though not limited to forgeries, the statute adopts a liability-shifting approach which codifies a depositor's duty to discover and report errors that are primarily due to the acts of intervening third parties—generally, third party wrongdoers. U.S.C. § 4.406(a).[7] The statute was certainly not intended to shield a bank from liability for its own errors. Thus, it is unreasonable to bootstrap a defense upon section 4.406 which foists responsibility upon the depositor to exercise diligence in the discovery of bank errors. Third, the section 4.406 defense is not available to a bank which has failed to exercise ordinary care in handling a depositor's account. U.C.C. § 4.406(c).[8] If the statute were deemed applicable, the exercise of ordinary

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief.

**5.** 11 U.S.C. § 108(b) provides as follows:
(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) 60 days after the order for relief.

**6.** U.C.C. § 4.406(d) provides as follows:
(d) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (Subsection (a)) discover and report his unauthorized signature of any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank

such unauthorized signature or indorsement or such alteration.

**7.** The customer's obligations to examine account statements and report unauthorized signatures and alterations are defined in U.C.C. § 4.406(a), which provides as follows:
**§ 4.406. Customer's Duty to Discover and Report Unauthorized Signature or Alteration**
(a) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and item available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

**8.** U.C.C. § 4.406(c) clearly indicates that the statute takes a liability shifting approach, which is not intended to shield the bank from its own negligence. Accordingly, subsection (c) provides as follows:
(c) The preclusion under Subsection (b) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

care would certainly include the implementation of reasonable commercial standards for the internal handling of a wire transaction.

8. This Court has jurisdiction over the instant proceedings pursuant to 28 U.S.C. § 1334(b).

9. In the event that the foregoing Findings of Fact also constitute Conclusions of Law, they should be regarded as such. In the event that the Conclusions of Law also constitute Findings of Fact, they are adopted as such.

### Conclusion

This Court concludes that Defendant, T.C.B., breached its implied contract of deposit with Minro, and acted negligently in wire transferring more to the account of I.T.C. than was requested by the depositor. Accordingly, Plaintiff is entitled to recover in the sum of Twenty-Five Thousand Dollars ($25,000.00), together with interest and costs.

Counsel will prepare an appropriate judgment incorporating by reference these Findings of Fact and Conclusions of Law for entry by the Court within twenty (20) days.