**MELLON BANK, N.A., Plaintiff,**

v.

**SECURITIES SETTLEMENT CORP., et al., Defendants.**

**Civ. No. 87–4726 (CSF).**

United States District Court,
D. New Jersey.

April 4, 1989.

Linda Lashbrook, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for plaintiff Mellon Bank.

Helen A. Salichs, Martin P. Unger, Gaston & Snow, New York City, Patricia Santelle, Timothy R. Greiner, Karen Palmer Hull, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for defendant Securities Settlement Corp.

## OPINION

CLARKSON S. FISHER, District Judge.

Before the court are the motions of plaintiff, Mellon Bank ("Mellon"), and defendant, Securities Settlement Corporation ("SSC"), for summary judgment. At oral argument, the parties agreed that the facts are not in dispute. The transaction underlying this case is relatively simple. SSC performed clearing services in connection with securities transactions in the accounts of one of its customers, Kobrin Securities ("Kobrin"). One of Kobrin's clients was another entity, Barrett Consultants ("Barrett"), to whom SSC sent monthly statements regarding Barrett's account with Kobrin. On the morning of June 4, 1985, SSC, at Kobrin's request, instructed Mellon to wire transfer $113,080.50 to Barrett's account with the Franklin State Bank ("FSB"). Within several hours after Mellon had sent the wire, SSC learned that

Kobrin was incapable of paying the securities' purchase price. Although SSC instructed Mellon to cancel the wire transfer, the money went through to Barrett's account. Mellon filed the instant complaint in October of 1987 in the Superior Court of New Jersey, Law Division, Somerset County, seeking reimbursement for the funds it had sent to FSB. SSC removed the case to this court in November of the same year.

The court will first address SSC's motion, viewing the evidence in the light most favorable to Mellon. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). SSC's motion does not empower the court to assume the function of the factfinder: The court need only determine whether the record would permit "a fairminded jury" to return a verdict in Mellon's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). These standards are unchanged by the fact that both parties have moved under Rule 56. *Daburlos v. Commercial Ins. Co.*, 367 F.Supp. 1017, 1020 (E.D.Pa.1973).

The threshold issue is whether Pennsylvania's version of the U.C.C. applies to this action.[1] SSC has cited several cases for the proposition that the U.C.C. does not govern wire transfers, *see e.g., Walker v. Texas Commerce Bank, N.A.,* 635 F.Supp. 678, 681 (S.D.Tex.1986), and contends that this case must be decided without reference to the statute. Mellon counters that the U.C.C. has been applied by analogy in other jurisdictions, *see e.g., Delbrueck & Co. v. Manufacturers' Hanover Trust Co.,* 609 F.2d 1047, 1051 (2d Cir.1979), and urges the court to do the same. Unfortunately neither party has cited, nor has the court found, decisions from the Pennsylvania state courts which address this question.

There are merits to both positions. On one hand it might be noted that the U.C.C. covers only "items," which 13 Pa.C.S.A. section 4104 defines as "any instrument for

1. Mellon and SSC agree that Pennsylvania law governs their rights and liabilities.

the payment of money even though it is not negotiable." *Id.* With this definition as a starting point, it might be added that an instrument is a signed writing which expresses an agreement regarding rights, while the instant case involves an unsigned and electronically-transmitted instruction. It could be asserted that this difference is not merely semantic; it illustrates that the U.C.C. was designed to address paper transactions rather than high-speed financial distributions. *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1982) (holding U.C.C. inapplicable because wire transfers were not in the drafters' contemplation). According to this argument Pennsylvania's trial/courts would not adjudicate this case under 13 Pa.C.S.A. section 4101 *et seq. See Walker*, 635 F.Supp. at 681; *Central Coordinates, Inc. v. Morgan Guaranty Trust Co.*, 129 Misc.2d 804, 494 N.Y.S.2d 602, 604 (N.Y.Sup.Ct., 1985) (both cases considering the term "item" to preclude application of the U.C.C. to wire transfers).

On the other hand, a "check is no more than an order on the bank to pay a stated amount ... from the maker's account." *Thomas v. First Nat'l. Bank*, 173 Pa.Super. 205, 96 A.2d 196, 197 (1953) *rev'd. on other grounds*, 376 Pa. 181, 101 A.2d 910 (1954). Although checks are negotiable instruments, *Urick Foundry Co. v. Workmen's Compensation Appeal Bd.*, 91 Pa. Cmwlth. 24, 496 A.2d 883, 885 n. 2 (1985), it could be argued that *Thomas*'s definition exactly fits a wire transfer, which is nothing more than an order directing the bank to pay money from one account to another. *See Delbrueck*, 609 F.2d at 1050 (likening wire transfer to cashier's check); *and see Miracle Hills Centre Ltd. v. Nebraska Nat'l Bank*, 230 Neb. 899, 434 N.W.2d 304, 306 (1989) (applying U.C.C. to bank's distribution of wire transfer funds among accounts). Moreover, it could be argued that the total exclusion of the U.C.C. from this case would leave the court with little current law upon which to base its decision.

Thus the court must sail between the Scylla of common law and the Charybdis of statute in an attempt to predict what Pennsylvania's highest court would do if confronted with this situation. *Radwan v. Beecham Laboratories*, 850 F.2d 147, 151 (3d Cir.1988); *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 377 (3d Cir.1987). The court must bear in mind that neither party should be "'penalized for [the presence of their suit in] a federal forum by being deprived of the flexibility that a state court could reasonably be expected to show.'" *Safeco Ins. Co. v. Wetherill*, 622 F.2d 685, 688 (3d Cir.1980) (*quoting Becker v. Interstate Properties*, 569 F.2d 1203, 1206 (3d Cir.1977), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978)). The court concludes that it should follow those decisions which have applied the common law while at the same time borrowing appropriate rules from the governing version of the U.C.C. *Delbrueck*, 609 F.2d at 1051 (applying common law but partially justifying holding by reference to U.C.C. sections 3–410, 4–303); *Bradford Trust Co. v. Texas American Bank–Houston*, 790 F.2d 407, 409 (5th Cir.1986) (using both common and statutory law); *Walker*, 635 F.Supp. at 684 & n. 8 (applying the common law but addressing affirmative defense taken from U.C.C. section 4–406).

Mellon's first theory of recovery relies on the Service Agreement with SSC. That contract provides, in pertinent part, that SSC will:

> [a]ssume full responsibility for all transfers made by the Bank in good faith and in accordance with these procedures, and agree that the Bank shall be conclusively deemed to have discharged its duties to act in good faith and to exercise ordinary care if it has followed these transfer procedures or if [SSC] has not followed them.

Service Agreement Letter, Annexed at p. 3a to Mellon's Brief in Support (henceforth "Agreement"). The "transfer procedures" are contained in *in camera* documents which detail Mellon's scheme for making and cancelling wire transfers. In addition, the Agreement provides that Mellon:

> will not be liable to [SSC] with respect to any aspect of its performance under this Agreement, except for the Bank's lack of

good faith or failure to exercise ordinary care.

*Id.* The parties dispute whether Mellon used ordinary care in cancelling the wire transfer, thereby placing it within the benefits and protections of the Agreement. Because the Agreement is silent about the cancellation of wire transfers, the parties' rights and duties are governed by Pennsylvania's common and statutory law. *See Hardex–Steubenville Corp. v. Western Pennsylvania Nat'l. Bank,* 446 Pa. 446, 285 A.2d 874, 879 (1971) (holding that where contract is silent, the U.C.C. will govern).

SSC had a right to stop the Mellon–MHT–FSB wire transfer, *Ajax Corp. v. Connecticut Mut. Life Ins. Co.,* 458 Pa. 57, 333 A.2d 469, 471 (Pa.1975); 13 Pa.C.S.A. section 4403(a), and Mellon was under a corresponding duty to use ordinary care in handling SSC's request. Simply put, ordinary care is non-negligence. *See Hardex,* 285 A.2d at 879 (identifying lack of ordinary care with negligence); 13 Pa.C.S.A. section 4103, comment 4 (stating that the Code uses " 'ordinary care' ... with its normal meaning and not in any special sense"). In this regard, behavior which is "consistent with clearing house rules and the like or with a general banking usage," raises a presumption that the bank used ordinary care. 13 Pa.C.S.A. section 4103(c). Before the court can determine whether Mellon is entitled to this presumption, or whether Mellon actually used ordinary care, it must examine the wire transfer at issue here.

The transfer was made under BankWire, a system maintained by Mellon and roughly 100 other banks. Deposition of K.L. Schultz, 89, 95–96; Deposition of David Taddeo, p. 35. BankWire procedure requires a customer's authorized representative to instruct Mellon to transfer money from the customer's account to the recipient's account in another bank. After receiving and verifying an instruction, Mellon personnel would when necessary select a "correspondent" bank. The correspondent bank would then serve as a conduit for the transfer to the recipient's bank. Taddeo Deposition, pp. 23–25.

This process does not transmit the funds themselves; rather, upon making the transfer Mellon would debit the customer for the the amount of the transfer, and credit the correspondent bank's account with Mellon. Schultz Deposition, pp. 86–87. Unlike another system called FedWire, which makes transferred funds immediately available to the recipient, BankWire funds become available on the day following the transfer.[2] Schultz Deposition, p. 85; Taddeo Deposition, pp. 28–29.

Because BankWire funds are not immediately obtainable, a cancellation does not require the bank to recapture the wired funds.[3] Deposition of Schultz at 86, 96–97. Essentially, a BankWire cancellation requires two steps. First, Mellon sends a cancellation notice to the "correspondent" bank, which in turn instructs the recipient bank to disregard the transfer. Second, Mellon reverses the credit/debit notation which it made upon receiving the transfer order; the customer's account is recredited and the correspondent bank's account is debited, thereby returning the balances to their pre-transfer sums. *Id.* at pp. 86–87. Mellon's objective regarding cancellations is to "make every effort to get the funds back for [its] customer." *Id.* at 85. Mellon apparently handles a large volume of wire transfer transactions: In 1985 the bank handled over 1,000 requests of all kinds per day, of which eight to ten sought cancellation. *Id.* at 84, 90–91.

Mellon's customers would be informed of a successful cancellation in one of two ways. Mellon might give a specific notice to the customer that the transaction had been recalled, or it might simply allow the

---

**2.** For this reason *Delbrueck & Co. v. Manufacturers' Hanover Trust Co.,* 609 F.2d 1047 (2d Cir.1979) provides little guidance; that case dealt with a wire transfer which made funds irrevocably available to the recipient. *Id.* at 1050–51.

**3.** In contrast, a FedWire cancellation requires Mellon to "ask[ ] for the money back," Deposition of Schultz, p. 87. Thus, it is easier to cancel a BankWire transfer than one made by FedWire. Taddeo Deposition, p. 29.

re-crediting of the customer's account to function as a notice. *Id.* at 112; Deposition of Kehoe, pp. 49–50. As to Mellon, correspondent banks would notify it only if there were problems in effecting the cancellation. Schultz Deposition, p. 99, Taddeo Deposition, pp. 31–32.

SSC instructed Mellon to cancel the wire on the same day it learned that the funds were not covered. SSC representative Michael Kehoe telephoned the bank shortly before four in the afternoon and asked:

KEHOE: Okay would you ask them to cancel this transaction?

MELLON: Okay we can. Okay and who am I speaking to again?

KEHOE: This is Mike.

MELLON: Okay, Mike, we'll take care of it.

KEHOE: Okay how will I know it will be cancelled?

MELLON: Well the only thing I can do is send them a service telling them to cancel it.

KEHOE: Okay and they'll

MELLON: Ah.

KEHOE: respond back to you?

MELLON: No not really, they don't normally respond back. It's just basically, if they, I guess, ah couldn't, they would probably respond back to us.

KEHOE: Okay. So tomorrow I should see ...

MELLON: Well you won't really see ...

KEHOE: I won't see a wire going out?

MELLON: You just will see the request being ignored; um, can you hold on one second 'till I pull up the actual item so I can take a look at it?

KEHOE: Sure.

MELLON: (after a thirty-five second pause) Okay one moment.

\* \* \* \* \* \*

MELLON: Okay Mike you will see reversal on that credit also as well

KEHOE: Okay.

MELLON: as the actual, uh, transfer being recalled.

KEHOE: Okay.

Affidavit of Michael Gindick, Exhibit "D".[4] Within several hours of this conversation, Mellon sent a notice to MHT instructing them to cancel the transaction:

RE YR BK WIRE 184B SENT AT 1348 IN NEXT DAY FUNDS FOR 113,080.50 FOR CDT FRANKLIN ST BK SOMERSET BNF BARRETT CONSULTANTS PLS NOTE CANCEL THIS TRANSFER PER CUSTOMER REQUEST B/O SECURITIES SETTLEMENT CORP. THANK YOU. MELLON PGH.

Gindick Exhibit "E." Shortly after this message was sent Mellon reversed its account entries; it restored the transferred amount to SSC's account, and debited MHT's account with Mellon to the same amount.

Mellon's notice contained two errors. First, it referred to "YR BK WIRE", i.e., a wire transfer *sent* by MHT rather than one received by it. Second, the notice gave a transaction number of "184B." Transaction numbers are assigned by BankWire to each transfer request. Deposition of Schultz, p. 114; Deposition of Kehoe, p. 48; SSC's 12(G) Statement, Paragraph 9. The wire's true number was "06040184B."

After Kehoe's conversation with Mellon's representative, SSC heard nothing from Mellon regarding the transfer. Mellon, however, heard from MHT on several occasions. On June 6, 1985, MHT telephoned Mellon to inform the bank that MHT had not received the June 4, 1985 wire. The transcript of this conversation reads, in pertinent part, as follows:

MELLON: ... then the customer changed their mind and they wanted it [cancelled]. We just reversed the entry. We sent you a Bankwire 0184B. Ok?

MHT: OK, because we're ...

MELLON: Telling you.

MHT: ... got it back.

MELLON: Well, you should have gotten that one.

MHT: What date?

MELLON: Same day.... And then they turned around and changed their

---

**4.** Henceforth, "Gindick Exhibit '___.'"

minds so we just sent you one to cancel it. The one that you have says reverse entry per customer request, Right?

MHT: Uh, ha.

MELLON: Yeh. That's what happended [*sic*]. It's just like an advice of reversal. You should have gotten the 0814B, though.

Gindick Exhibit "H". The next day MHT again contacted Mellon and informed the bank that MHT had no record of receiving a wire transfer denominated by ISN 184B.

Mellon replied to neither of these correspondences. Although Mellon contends that this conclusion is unsupported by the record, the uncontradicted deposition of an MHT representative, Mr. Murphy, contains the following testimony:

Q: This document states 'No record of reply,' and talking about MHT 005, 'No record of reply to this wire from 7/6/24.' During the course of your investigation, were you informed that there was no reply to this document.

A: Yes.

Deposition of Murphy, p. 59. "MHT 005" is a document informing Mellon that MHT had no record of recieving the wire ISN 184B. Defendant's Exhibit "I." There is no evidence that Mellon took any action regarding MHT's two messages.

On July 12, 1985, MHT wired Mellon that it intended to credit FSB with $113,080.50. In the same communication MHT asked Mellon to wire them in return should Mellon not want the transaction to be completed. MHT also asked that Mellon credit MHT's account with $113,080.50. Four days later Mellon wired MHT that cancellation instructions had already been issued by Mellon on June 4, 1985. Mellon's wire contained, for the first time, the correct transaction number. Two days after this,

on July 18, 1985, MHT requested that FSB authorize a reversal of the June 4 transfer. The next day FSB informed MHT that Barrett had already withdrawn the money.

■ No reasonable fact finder could conclude that Mellon acted with ordinary care regarding the cancellation.[5] Mellon incorrectly identified the transaction to be cancelled, both by omitting five digits from the transaction number and by indicating that it sought to cancel a wire sent by MHT. The latter error might be considered inconsequential; after all, MHT did respond to Mellon within forty-eight hours to ask about Mellon's wire. But the inaccurate transaction number persisted throughout MHT's attempts to comply with Mellon's instructions; this error tainted such attempts for over one month.

Mellon's error easily ranks with those considered sufficient to constitute a breach of a bank's duty of ordinary care.[6] The record demonstrates that Mellon inaccurately carried out SSC's instructions and that, even though it was twice given notice of MHT's corresponding inability to cancel the wire, Mellon failed to take prompt remedial action. *See Walker*, 635 F.Supp. at 682 (bank has duty promptly to correct errors concerning inaccurate wire transfer). Indeed, the court notes that Mellon's failures transgressed its own internal guidelines. *See in camera* Document, denominated # MT–2507–2.

■ At this point it is proper to discuss Mellon's reliance on 13 Pa.C.S.A. section 4303. That statute provides that a stop order, "whether or not effective under other rules of law," cannot affect the bank's right to recovery if the bank:

(3) Settled for the item without reserving a right to revoke the settlement and

---

5. Although Mellon claims the benefit of the presumption embodied in 13 Pa.C.S.A. section 4103(c), it has not put forth evidence concerning the "clearing house rules and the like" or "general banking usage." *Id.* The requisites for obtaining the benefit of this presumption are objective evidence, not the evidence of defendant's own procedures. *See id.,* comment 3.

6. *See e.g., Walker,* 635 F.Supp. at 680 (holding bank negligent for wiring $25,000 more than requested); *Evra Corp. v. Swiss Bank Corp.,* 522 F.Supp. 820, 829 (N.D.Ill.1981) *rev'd. on other grounds,* 673 F.2d 951 (7th Cir.1982) (finding negligence where, *inter alia,* bank automatically confirmed receipt of instructions regardless of whether such instructions were recorded for later action).

without having such right under statute, clearing house rule or agreement. 13 Pa.C.S.A. section 4303(a)(3). Mellon claims that it "settled for the item" when it wired the money to MHT.[7] But "settlement" is a final, irrevocable payment of a wire transfer. *Id.*, comment 2; *and see* 13 Pa.C.S.A. section 4104(a) (dividing "settle" into "final" and "provisional" categories). A settlement is "final" under this subsection if the stop order *"cannot* interfere with the payment of the item." 13 Pa.C.S.A. section 4303(a)(3), comment 2 (emphasis supplied). In this case, Mellon received and acted upon SSC's stop order before Barrett could have had access to the funds. Moreover, Mellon simultaneously re-credited SSC and debited MHT, thereby financially erasing the transaction and giving an irrefutable indication that its own action was not a final settlement. *See* 13 Pa.C.S.A. section 4403(a) (valid stop orders are those which "afford the bank a reasonable opportunity to act").

Regarding both the "ordinary care" and "settlement" points the court notes the recent decision, cited by neither party, of *FJS Electronics, Inc. v. Fidelity Bank*, 288 Pa. Super. 138, 431 A.2d 326 (1981). In that case plaintiff FJS stopped payment on a check which it had drawn on defendant Fidelity Bank. Although the FJS officer who issued the stop order was expressly told that "every bit of information" about the check had to be accurate, 431 A.2d at 327, he nonetheless erred by fifty cents in giving the check's amount to Fidelity Bank. Without the correct amount, Fidelity Bank's computer was unable to pull the check. *Id.* at 327. The superior court held that the stop order was binding because FJS afforded Fidelity Bank a "reasonable opportunity to act." *Id.* at 328. The court went on to affirm an award to FJS, saying:

The position taken by [section 4403] is that stopping payment is a service which depositors expect and are entitled to receive from banks notwithstanding its difficulty, inconvenience and expense. The inevitable occasional losses through failure to stop should be borne by the banks as a cost of the business of banking. *Id.* at 328 (*quoting* 13 Pa.C.S.A. section 4403, comment 2). The superior court's reasoning defeats Mellon's argument that it used ordinary care, as well as the bank's claim that it was not bound by SSC's stop-payment request. *See* Mellon's Brief in Support, p. 21.

This finding also controls Mellon's claim for conversion. SSC contends that Pennsylvania defines conversion as the unjustified use or interference with another's rights in chattel; therefore, the intangible right given by Mellon's recrediting cannot be subjected to the tort. *See generally Northcraft v. Edward C. Michener Assocs.*, 319 Pa.Super. 432, 466 A.2d 620, 628 (1983) (stating that conversion is "limited to chattels of an existing nature; i.e., those whose existence is ascertainable by some concrete proof"); *Stevenson v. Economy Bank*, 413 Pa. 442, 197 A.2d 721, 726 (1964) (defining conversion in similar terms). Mellon counters that 13 Pa.C.S.A. section 3419 extends conversion to the misappropriation of intangible rights to money. In support of this argument Mellon cites *D & G Equip. v. First Nat'l. Bank*, 764 F.2d 950 (3d Cir.1985), which it claims followed this reading of the act.

 The court need not probe this novel issue. Mellon's conversion claim does not center around ledger entries, nor on the particular specie kept by SSC, but on an amount of $113,080.50. Therefore, Mellon can survive SSC's motion only if there is a genuine issue of material fact as to wheth-

---

7. Mellon also quotes 13 Pa.C.S.A. section 4303(a)(4), which provides that a stop order comes too late if the bank has:

Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item.

*Id.* But Mellon has not developed an argument under this subsection. Moreover, the specific reference to "posting" the item clearly places it outside the court's ability to reasonably borrow from the U.C.C.. Finally, Mellon's recrediting of SSC's account falls far short of indicating the bank's "decision to pay the item." *Id.*

er SSC interfered with Mellon's right to the money. *Stevenson,* 197 A.2d at 726. Here it does not matter whether the $113,080.50 was a chattel, an intangible outside the law of conversion, or an intangible placed within that law by 13 Pa.C.S.A. section 3419. Mellon's rights are conditioned upon the validity of SSC's stop order, *see* 13 Pa.C.S.A. sections 4303, 4403(a) (predicating bank's right to funds transferred over stop-order on such order's affording bank "reasonable opportunity" to act); if Mellon sent the amount without a right to do so, it has no claim for reimbursement from SSC. SSC's order gave Mellon a reasonable opportunity to act; indeed, had the bank not recredited the account, it would be liable to SSC for the funds. *FJS Electronics,* 431 A.2d at 328. Therefore Mellon has no right to the amount which could be the subject of conversion.

■ Nor does equity prevent the dismissal of the case. Before reaching the merits of Mellon's arguments, the court notes that a prerequisite to equity jurisdiction is a showing of an inadequate, as opposed to unavailing, legal remedy: *Goadby v. Philadelphia Elec. Co.,* 639 F.2d 117, 122 (3d Cir.1981); *Brunwasser v. Jacob,* 453 F.Supp. 567, 571 (W.D.Pa.1978), *affd.,* 605 F.2d 1194 (3d Cir.1979); *Birch v. Mazander,* 678 F.2d 754, 756 (8th Cir.1982). Equity will not intervene in a contract dispute over readily-ascertainable damages. *Huntington Beach Union High School Dist. v. Continental Information Systems Corp.,* 621 F.2d 353, 357 (9th Cir.1980); *Central Storage & Transfer Co. v. Kaplan,* 37 Pa.Cmwlth. 105, 389 A.2d 711, 714–15 (1978), *aff'd,* 487 Pa. 485, 410 A.2d 292 (1979). In this case the parties' rights and liabilities are governed by such a contract. Therefore, under its inherent power to address deficiencies in its jurisdiction, the court dismisses Mellon's equitable claims. *Matthews v. Rodgers,* 284 U.S. 521, 524, 52 S.Ct. 217, 219, 76 L.Ed. 447 (1932); *Knights of the Ku Klux Klan v. Monmouth Pleasure Club Ass'n.,* 34 F.2d 730, 732 (3d Cir.1929).

Even were the court not compelled to do so, "[w]hen the rights of a party are clearly established by defined principles of law, equity should not challenge or unsettle those rights. Equity follows the law." *First Federal Savings & Loan Ass'n. v. Swift,* 457 Pa. 206, 321 A.2d 895, 897 (1974) *citing Hedges v. Dixon County,* 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893); *Central Storage,* 389 A.2d at 715. "Hence, one who invokes equity must demonstrate ... that he has been the victim of an ... injury ... which the law recognizes; that is, is cognizable at law." *Id.* Mellon's negligence breached the bank's obligations under the Agreement, as well as under the applicable common and statutory law. Therefore, satisfaction of Mellon's claims would create rights not recognized by the law; this the court may not do. *Magniac v. Thomson,* 56 U.S. (15 How.) 281, 302, 14 L.Ed. 696 (1853); *Central Storage,* 389 A.2d at 715; *Bauer v. P.A. Cutri Co.,* 434 Pa. 305, 253 A.2d 252, 255 (1969); *Abrahams v. Wilson,* 134 Pa.Super. 297, 3 A.2d 1016, 1019 (1939).

Moreover, Mellon's equitable claims are without merit. The bank's first argument rests on the maxim that "where a loss must be borne by one of two innocent persons, equity will impose the loss on that party whose act first could have prevented the loss." Mellon's Brief in Support, p. 21. Mellon claims that SSC's mistaken sending of the funds places it in this position. But as the Supreme Court of Pennsylvania has said:

'courts of equity will not relieve a party from the consequences of an error due to his own ignorance or carelessness when there were available means which would have enabled him to avoid the mistake if reasonable care had been exercised.'

*Swift,* 321 A.2d at 898 (*quoting Home Owners' Loan Corp. v. Crouse,* 151 Pa.Super. 259, 30 A.2d 330, 332 (1943)). Mellon's negligence renders it incapable of recovering from SSC. *Lund v. Heinrich,* 410 Pa. 341, 189 A.2d 581, 584 (1963); *Johnson v. First Nat'l. Bank of Beaver Falls,* 367 Pa. 459, 81 A.2d 95, 96–97 (1951).

Mellon's second argument appears to

rest[8] on the principle that, as between two innocent parties, "the loss should be borne by him who put the wrongdoer in a position of trust and confidence and thus enabled" the wrongdoer to occasion the loss. *Manzitti v. Amsler*, 379 Pa.Super. 454, 550 A.2d 537, 543 (1988). Mellon contends that "whatever stockbrokerage manipulations" took place between SSC, Barrett and Kobrin, were done on "SSC's' 'turf'"; therefore "SSC must bear the loss occasioned by the behavior of its own two customers." Brief in Support, p. 23. *Manzitti*, however, clearly explains the maxim's application; "a principal acting through an agent in dealing with an innocent third party must bear the consequences of the agent's fraud." *Manzitti*, 550 A.2d at 543. Presumably, Mellon is the innocent third party. But SSC undertook to make the necessary transfers as Kobrin's or Barrett's agent; nothing before the court indicates that the latter entities bought and sold stock at SSC's command. Moreover, the sweeping form of the rule urged by Mellon would hold every bank, indeed every agent, liable for the nonsufficient-funds checks which pass through their hands.[9]

### Conclusion

Upon examining the record and the parties' arguments, the court concludes that no reasonable finder of fact could grant Mellon the relief it seeks. Rather, it is SSC who is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is granted for SSC against all Mellon's claims. An order accompanies this opinion. No costs.

### ORDER

This matter having come before the court on the motions of plaintiff and defendant Securities Settlement Corporation for summary judgment, and the court having considered the written submissions and oral arguments of counsel, and good cause appearing,

It is on this 4th day of April, 1989;

ORDERED that the motion of plaintiff for summary judgment be and hereby is denied, and it is further

ORDERED that the motion of defendant Securities Settlement Corporation for summary judgment be and hereby is granted, and plaintiff's claims against Securities Settlement Corporation be and hereby are dismissed.

---

8. Mellon has not provided the court with citation to Pennsylvania law. It relies, *inter alia*, on Pomeroy's *Equity Jurisprudence*, and assertions about what "[m]ost law school graduates recognize." Mellon's Brief in Support, p. 22.

9. Both the above arguments also prohibit Mellon from claiming unjust enrichment. As noted above, SSC has the superior equity in that Mellon's negligence occasioned the loss. Moreover, Mellon makes much of SSC's allowing the "wrongdoers" to withdraw funds from their account with SSC pursuant to a Bankruptcy court order, after SSC was aware that Mellon was claiming the $113,080.50 from it. But, as the court's opinion has made clear, SSC is not liable to Mellon. Nor has Mellon cited authority that SSC has a duty to assist Mellon's efforts to collect damages from parties who have allegedly wronged it.