**Marvin L. WARNER, Petitioner–Appellant,**

v.

**Rex A. ZENT, Warden, Respondent–Appellee.**

**No. 92–4339.**

United States Court of Appeals, Sixth Circuit.

Argued April 29, 1993.

Decided June 7, 1993.

Rehearing and Rehearing En Banc Denied July 26, 1993.

of debentures to the public, Home State went bankrupt. The bankruptcy was precipitated by the financial collapse of a Florida securities dealer with which both Home State and Mr. Warner had had extensive business dealings over the years and to which Home State had paid over $114 million in 1983 pursuant to a series of margin calls.

Following the demise of Home State, Mr. Warner and two co-defendants were placed on trial in an Ohio common pleas court on charges of securities fraud, willful misapplication of Home State funds, and unauthorized transfer of drafts or other written instruments belonging to Home State. The jury found Mr. Warner innocent of the majority of the charges against him, but a verdict of guilty was returned on three counts of securities fraud and six counts of unauthorized transfer. The convictions were set aside by an Ohio court of appeals, but were later reinstated by the Supreme Court of Ohio. See *State v. Warner,* 55 Ohio St.3d 31, 564 N.E.2d 18 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). Mr. Warner instituted the present federal habeas corpus proceeding in 1991. The matter is before us now on appeal from a judgment in which the district court denied habeas relief.

Michael R. Barrett, Cincinnati, OH, Timothy K. Ford (argued and briefed), MacDonald, Hoague & Bayless, Seattle, WA, for petitioner-appellant.

John J. Gideon, Office of the Atty. Gen. of Ohio, Mark A. Vander Laan, Carl J. Stich, Jr. (argued), Kenneth S. Resnick, Lawrence Anthony Kane, Jr. (briefed), Mary Gabrielle Hils, Dinsmore & Shohl, Cincinnati, OH, for respondent-appellee.

Before: JONES, GUY, and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Marvin L. Warner, the petitioner in this habeas corpus case, owned a controlling interest in the corporation of which Home State Savings Bank, a Cincinnati building and loan association, was once a subsidiary. In 1985, a few months after selling an issue

Mr. Warner contends that the district court ought to have held that the State of Ohio violated his federal constitutional rights by (1) construing ambiguous state laws as criminalizing acts (recklessly making wire transfers of institutional funds without authorization) the forbidden character of which had not been clear at the time the acts were committed; (2) failing to give Mr. Warner fair notice, in the indictment or elsewhere, of the culpable mental state required for conviction on the unauthorized transfer charges; (3) physically delivering to the jury written instructions to which counsel were not privy, and failing to let the jury see written instructions that it should have seen; and (4) allowing the jury to find Mr. Warner guilty of securities fraud on the basis of a conclusive presumption that he misrepresented facts "knowingly," although the proofs presented at trial only showed that he ought to have

known the facts to be other than as represented.

The respondent warden, represented by a special prosecutor retained by the state, maintains that (1) Ohio law was clear on the criminality of what Mr. Warner did, and the claim of constitutional error in this respect was not preserved for habeas review in any event; (2) Mr. Warner received actual notice of the culpable mental state prescribed by statute for the unauthorized transfer offenses, and he suffered no prejudice by reason of the deficiencies of the indictment in this respect; (3) the error committed by the state trial court in refusing to let counsel see the written copy of the jury instructions which (along with 12 boxes of exhibits) went to the jury room after the jury had been instructed orally did not so prejudice the defense as to make Mr. Warner's conviction unconstitutional; the factual issues associated with the supposed failure to give supplemental written instructions, moreover, were conclusively resolved against Mr. Warner by the Ohio courts; and (4) the statutory "presumption" complained of, as set forth in Ohio Rev.Code § 1707.29, is not a presumption at all; as the Ohio Supreme Court noted, the statute "merely sets forth what the term knowledge encompasses for purposes of criminal liability...." *State v. Warner*, 564 N.E.2d at 42.

Upon review of the briefs and such of the record as has been placed before us, and upon consideration of the oral arguments presented at a hearing held (at Mr. Warner's request) on an expedited basis, we conclude that the district court did not err in denying the petition for a writ of habeas corpus. We shall therefore affirm the district court's judgment.

## I

Although he was not an officer or director of Home State, Mr. Warner controlled the institution through ownership of stock in its parent company, Home State Financial, Inc. In 1977 Mr. Warner was instrumental in having Home State Savings Bank embark on what proved to be a long-term business relationship with ESM Government Securities, Inc., a small broker-dealer located in Florida. ESM became the primary broker for Home State's purchases and sales of government securities and borrowings under reverse repurchase agreements, or "repos."[1]

Over the years, Home State relied on ESM to purchase many hundreds of millions of dollars' worth of government securities for it and to provide the financing for such purchases. As noted above, Home State "sold" the securities to ESM under long term reverse repurchase agreements that represented collateralized borrowings by Home State; ESM did not necessarily retain the collateral, however, because it could sell the securities to others under new repurchase agreements.

Home State's transactions with ESM came under the scrutiny of the Ohio Division of Savings and Loan Associations, a regulatory arm of the state, and the Ohio Deposit Guar-

1. As explained by the Ohio Supreme Court,

"A repurchase agreement is similar to a collateralized loan, with the security subject to repurchase pledged as collateral. The repurchase agreements between Home State and ESM were of two types. In the first type of transaction, Home State 'sold' securities in its investment portfolio to ESM, subject to Home State's obligation to repurchase and ESM's obligation to convey the securities at a later date for a specified price. The funds paid by ESM to Home State for the securities in effect constituted a loan to Home State from ESM, with the securities pledged by Home State serving as collateral. Home State periodically paid interest on the borrowed funds and received the coupon interest paid on the securities. In the second type of transaction, Home State purchased securities at a discounted price, and ESM simultaneously extended to Home State a loan, collateralized by

the securities purchased. Again, Home State agreed to repurchase and ESM agreed to reconvey the securities at a later date, and Home State's interest payment came due on that date. In both types of transaction, the security subject to repurchase passed into ESM's possession for the term of the repurchase agreement and could be sold by ESM to third parties under an additional repurchase agreement.

"Whether a transaction is characterized as a repurchase agreement or a reverse repurchase agreement depends on whether the transaction is viewed from the perspective of the party supplying funds or the party acquiring funds. Viewed from Home State's perspective, the transactions were reverse repurchase agreements because Home State was 'selling' securities and 'borrowing' funds rather than 'buying' securities and 'lending' funds." *State v. Warner*, 564 N.E.2d at 22, n. 2.

antee Fund, a private entity that insured Home State deposits. Both the Division and the Fund became concerned that Home State was giving ESM far too much collateral in relation to the amount of money borrowed. An examiner for the Division concluded in a 1982 report that Home State's overcollateralization was "unsafe and unsound." The Fund agreed, and beginning in 1982 it issued a series of directives in which Home State was told to reduce its involvement with ESM. Home State did not comply, and early in 1983 it entered into a $700 million reverse repo transaction with ESM.

On February 25, 1983—apparently before it knew of the most recent transaction—the Fund sent Home State a letter saying, among other things, that:

> "We are most concerned with the extreme amount of over-collateralization of the reverse repo (borrowed money) with ESM Government Securities. As of June 30, 1982, [Home State] has borrowed money from ESM of $83.8 million and collateral assigned aggregating a market value of $177.1 million, which is $93.3 million in excess[,] or a voluminous 211.2% of the amount borrowed.

> \* \* \* \* \* \*

> "This substantial over-collateralization of the borrowed money to ESM is an unsafe and unsound practice, and is completely unacceptable to the Ohio Deposit Guarantee Fund as it should be to you. This potential risk to Home State and the Fund cannot be permitted to continue.

> "We direct you to reduce the market value of Home State's collateral to an amount ranging from 105 to 110% of the amount borrowed from ESM. This reduction must occur as soon as possible, but in no event later than the present term of the reverse repos which, we understand, is no later than June 30, 1983."

On April 28, 1983, Home State's board of directors resolved to comply with the February 25 letter from the Fund. Evidence presented at trial indicated that the board's resolution was not subsequently modified or rescinded, "and that the board never gave anyone [including Mr. Warner] authority to act contrary to its terms." *State v. Warner,* 564 N.E.2d at 24.

The market value of the government securities purchased by Home State declined in 1983, and, pursuant to the repurchase agreements, Home State received a series of margin calls. Between May of 1983 and October of that year ESM made 41 margin calls totaling more than $114 million. Home State honored each of these margin calls, notwithstanding that the institution was thereby violating the April 28 resolution of its board of directors.

Mr. Warner personally approved the honoring of the last six margin calls, pursuant to which a total of $12.2 million was transferred from Home State to ESM by wire. The payments on the six margin calls in question, made between August 29 and October 14, 1983, constituted the "unauthorized transfers" for which Mr. Warner was ultimately convicted.

The securities fraud charges against Mr. Warner arose out of Home State's sale of a multi-million dollar debenture issue in 1984. Home State Financial, the parent corporation, needed to raise almost $30 million to retire maturing debt. The parent corporation filed a registration statement with the Securities and Exchange Commission for a new issue of debentures, but the SEC, concerned about the ESM situation, did not permit the proposed offering to go forward. This problem was circumvented through the stratagem of merging the parent into the subsidiary. The surviving company—a financial institution exempt from SEC registration—was able to issue the debentures without registration.

The offering circular for the new issue of debentures was reviewed and revised by Mr. Warner personally. The circular greatly overstated the value of Home State's assets. It also incorporated by reference certain reports that contained misstatements as to Home State's relationship with ESM.

Early in 1985 Mr. Warner and Home State learned that ESM had sustained huge losses. These losses—which ESM had been covering up in financial statements which it falsified with the complicity of a corrupt certified

public accountant—amounted to some $300 million. ESM filed a petition in bankruptcy on March 4, 1985, and Home State closed its doors four days later. The value of the government securities that Home State then had at risk as a result of its transactions with ESM was approximately $140 million. The Ohio Deposit Guarantee Fund could not cover a loss of that magnitude, and the Governor of Ohio temporarily closed all financial institutions insured by the Fund. It was in the wake of this state-wide crisis that Mr. Warner and two former presidents of Home State, David J. Schiebel and Burton M. Bongard, were indicted in December of 1985.

In addition to four charges of securities fraud, one of which was dismissed by the court prior to trial, the indictment contained 41 counts in which the defendants were charged with violations of Ohio Rev.Code § 1153.01. That statute reads as follows:

"No president, director, trustee, committee member, secretary, treasurer, attorney, or other officer or agent of a building and loan association shall embezzle, abstract, or willfully misapply any of the moneys, funds, or credits of the association; nor shall he issue or put into circulation a warrant or other order, or assign, transfer, cancel, or deliver a note, bond, draft, mortgage, judgment, decree, or other written instrument belonging to the association, or raise or receive money for and in the name of such association, unless authorized to do so by its board of directors."

Each of the 41 counts involving § 1153.01 charged that the defendants, acting "with the intent to injure or defraud the Bank," violated the statute by (a) willfully misapplying, through transfer to ESM, monies, funds, or credits of Home State; (b) failing to obtain the return of the funds, which was also alleged to constitute willful misapplication; and/or (c) assigning, transferring or delivering notes, bonds, drafts or other written instruments belonging to Home State without the authorization of the institution's board of directors.

Contending that these counts were duplicative—*i.e.,* that they violated the rule against charging more than one offense in a

single count—the defendants moved that the state be required to make an election among the duplicative charges. In briefing this motion Mr. Warner and his co-defendants told the common pleas court that Ohio Rev.Code § 1153.01 "plainly encompasses more than the single offense of 'misapplication.'" The defendants went on to explain that

"Misapplication is only one of two offenses encompassed in the section; the other offense consists of taking certain actions without authorization of the board of directors. The 'misapplication' offense is specified in the portion of the section before the semicolon; the 'unauthorized acts' offense is specified in the portion of the section after the semicolon."

Unauthorized acts offenses, the defendants added, "clearly are broader than the offenses of embezzlement, abstraction, and willful misapplication created in the first part of the section; significantly, no 'conversion or taking' is required by the 'unauthorized acts' provision."

The common pleas court agreed with the defendants' reading of the statute. The court did not order an election, however, but directed instead that the charges be severed. The indictment was then amended so that each of the 41 original counts based on the honoring of the 41 margin calls was split into two separate counts. The odd-numbered counts charged willful misapplication, and the even-numbered counts charged unauthorized transfer. The allegation that the defendants acted with intent to injure or defraud was retained in each one of the 82 new counts, notwithstanding that under the reading of the statute urged by the defendants and accepted by the court, the mere transfer of assets without board authorization (the offense created by the language following the semicolon) did not entail a conversion or willful taking of assets.

In August of 1986 the state filed proposed jury instructions regarding the § 1153.01 counts. As to the unauthorized transfer offenses, the state proposed abandoning the "intent to injure or defraud" rubric used in the indictment. It proposed instead that the jury be told that in order to find the defendants guilty of the unauthorized transfer

charges it would have to find that the defendants acted "knowingly." The defendants opposed this suggestion, filing a brief in which they argued that the jury instructions should track the language of the indictment.

The mental state required for conviction on the unauthorized transfer charges was discussed at a pretrial hearing conducted by the trial judge in November of 1986. The issue was not definitively resolved at this conference, but the judge explicitly questioned whether intent to injure or defraud was the appropriate mental state for a crime created by a statute that did not specify such intent.

On December 4, 1986, shortly before the selection of the jury began, the trial judge invited the parties' attention to Ohio Rev. Code § 2901.21(B). Section 2901.21(B) reads as follows:

"When the section defining an offense does not specify any degree of culpability, and plainly indicates [sic] a purpose to impose strict criminal liability for the conduct described in such section, then culpability is not required for a person to be guilty of the offense. *When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense.*" (Emphasis supplied.)

The judge expressed the view that because the unauthorized transfer language of § 1153.01 "does not specify any degree of culpability nor plainly indicates a purpose to impose strict liability," proof of recklessness would suffice to establish criminal liability. The judge said that his decision on this point was not final, and he invited further briefing on the question.

Neither Mr. Warner nor either of the other defendants asked that a definitive ruling be made before the start of the trial. No one requested a continuance. When the trial began, it is fair to say, the defendants not only had actual knowledge of the contents of the Ohio Rev.Code § 2901.21(B), they had actual notice that the judge might well instruct the jury, pursuant to this statute, that the culpable mental state for the unauthorized transfer offenses was "recklessness." [2]

During the presentation of the state's case, the trial judge did precisely what he had spoken of doing. In a cautionary instruction delivered prior to the testimony of one of the principals of ESM, the jury was told that as far as the crime of transfer without authorization from the board of directors was concerned, "[t]he culpable mental state is recklessness." [3] Mr. Warner's attorney objected that the instruction was erroneous, but, not surprisingly, made no claim of surprise.

The trial, which had begun early in December of 1986, continued into February of 1987. A jury charge conference was held on February 13, 1987, at which time the instructions relating to the § 1153.01 counts were discussed. By that time the state had filed a brief supporting a "recklessness" *mens rea* for the unauthorized transfer counts, and the defendants had filed an opposing brief. Although Mr. Warner's counsel argued at the charge conference that it would be a denial of due process not to instruct the jury that the crime of willful misapplication requires intent to injure or defraud, no such constitutional argument was presented with respect to the unauthorized transfer counts.

2. Ohio Rev.Code § 2901.22(C) gives the following explanation of the term:

"A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

"Recklessness" is a higher degree of culpability than mere negligence. See Ohio Rev.Code § 2901.22(D):

"A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist."

3. The court reporter transcribed the last word as "requisite," but the transcript of the ensuing bench conference shows that the judge must have said "recklessness."

On February 17, 1987, the day before the presentation of closing arguments, the judge confirmed to counsel that the jury would be given "recklessness" instructions in connection with the unauthorized transfer counts. In the closing arguments that followed, the prosecutor contended that Mr. Warner had been reckless in acting as the *de facto* chief executive of Home State without bothering to read the board resolutions that were sent to him. The argument presented in response was that Mr. Warner learned on August 29, 1983, of the resolution adopted by the board on April 28; that he immediately issued a memorandum directing that no further margin calls be honored without his approval; and that it was not reckless for him to assume that officers who had been meeting margin calls for years continued to have board authorization to do so.

On February 20, 1987, following the completion of the parties' oral arguments, the trial court gave a comprehensive and balanced set of oral instructions to the jury. With respect to the unauthorized transfer counts the jury was told that the offense could not be established without proof beyond a reasonable doubt that the defendants acted "recklessly." The court went on to explain that "[a] person is reckless with respect to circumstances when, with heedless indifference to the consequences, he or she perversely disregards known risk that such circumstances are likely to exist."

In the instructions relating to the securities fraud counts the jury was given a detailed explanation of Ohio Rev.Code § 1707.-29. That statute provides that in prosecutions for securities fraud, "the accused shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence, he should, prior to the alleged commission of the offense in question, have secured such knowledge."

At the conclusion of its explanation of Ohio Rev.Code § 1707.29, and after defining "reasonable diligence," the trial court gave these instructions:

"Thus ... a person is criminally liable if he represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts.

"On the other hand[,] of necessity, a good faith belief in facts which he should have know[n] to be otherwise had he exercised reasonable diligence to ascertain the true state of facts."

Objections to the jury instructions were heard in chambers before the jury retired to deliberate. Referring to the incomplete sentence at the end of the passage quoted above, Mr. Warner's counsel noted that the court had skipped a line in charging on good faith belief in connection with Ohio Rev.Code § 1707.29. Warner's counsel also renewed his objection to the charge on recklessness, but did not assert that it was unconstitutional. No issue was raised, either at this point or at any other stage of the trial proceedings, as to whether a wire transfer could violate the prohibition against unauthorized transfer of a "draft" or "other written instrument."

Following the conference in chambers, and before the jury was sent to deliberate, the court gave several supplemental instructions. In these charges the jury was told that savings and loan associations are permitted to invest in government securities; that the motives of a witness may be considered in weighing his testimony; and that charges of securities fraud based on nondisclosure may not be sustained in the absence of a duty to disclose. The court also supplemented its instruction on Ohio Rev.Code § 1707.29, telling the jury that "if the defendant had a good faith belief in the existence of the facts represented, and acted in accordance with the facts as he believed them to [be], he is not guilty of selling securities fraudulently, as his knowledge is an essential element of that crime."

The voluminous body of paper placed in the jury room when the jury retired included a binder containing a written version of the jury instructions. Both the prosecutor and counsel for the defendants requested permission to examine the contents of the binder; inexplicably, however, permission to do so was refused.

The binder did not include copies of the four supplemental instructions. This omission was the subject of discussions between

the court and counsel on the morning of February 21, 1987, and it appears that the supplemental instructions were retyped by a court reporter and taken to the jury room by a constable soon thereafter. No one objected to this procedure.

The jury returned its verdict on March 2, 1987. Mr. Warner was found guilty on all three of the securities fraud charges and on the last six of the unauthorized transfer charges. He was found not guilty on the first 35 unauthorized transfer charges and on all of the 41 willful misapplication charges. The court denied a post-verdict motion for acquittal and sentenced Mr. Warner to a term of imprisonment which, as of this writing, has only a matter of weeks still to run.

Mr. Warner perfected an appeal to the state court of appeals, which reversed the convictions in an unpublished opinion issued in November of 1989. As stated above, the Ohio Supreme Court reversed the court of appeals decision and reinstated the convictions. A motion to reconsider was denied for the most part, the Ohio Supreme Court making no changes in its decision other than one relating to restitution. A petition for certiorari was subsequently denied by the Supreme Court of the United States.

The present habeas corpus proceeding was commenced in the United States District Court for the Southern District of Ohio in July of 1991. The matter was referred to Magistrate Judge Robert A. Steinberg, who in March of 1992 filed a comprehensive report and recommendation on cross-motions in which the parties had sought partial summary judgment. A second report and recommendation followed in April. Both reports were adverse to Mr. Warner, and he filed timely objections. In November of 1992 the district court (Herman J. Weber, J.) adopted the magistrate judge's reports and recommendations with some modification and entered judgment denying Mr. Warner's petition for a writ of habeas corpus. This appeal followed.

## II

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," the Supreme Court declared in striking down an early state-law version of the Davis–Bacon Act, "violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This "void for vagueness" doctrine, as it is sometimes called, was given the following formulation in *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954):

> "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (Footnote omitted.)

This principle applies with particular force, the Supreme Court has said, "where ... a statute precise on its face has been unforeseeably and retroactively expanded by judicial construction...." *Bouie v. City of Columbia*, 378 U.S. 347, 352, 84 S.Ct. 1697, 1701–02, 12 L.Ed.2d 894 (1964). "Indeed," the *Bouie* court continued, "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* at 353, 84 S.Ct. at 1702. See generally *United States v. Salisbury*, 983 F.2d 1369, 1377–80 (6th Cir. 1993), where other decisions in this line of authority are marshalled.

Mr. Warner submits that in placing a construction on Ohio Rev.Code § 1153.01 that criminalized his transfers to ESM, the Ohio courts worked "an unforeseeable judicial enlargement" of the statute. The courts enlarged the statute, he says, in two ways: (1) by interpreting it to include unauthorized transfers made "recklessly," as opposed to those made with intent to injure or defraud; and (2) by interpreting it to include *wire* transfers, as opposed to transfers of what the statute calls a "draft ... or other *written instrument*...." (Emphasis supplied.)

The district court found that both branches of Mr. Warner's statutory enlargement argument had been waived as a result of failure to present them to the state courts. Where state courts have not been given a fair opportunity to examine a federal constitutional argument, it is clear, federal habeas relief may not be predicated thereon unless the petitioner can demonstrate either (1) cause for the default and actual prejudice resulting from the alleged constitutional error, or (2) a fundamental miscarriage of justice. *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

The district court may or may not have been correct in holding here that Mr. Warner's statutory enlargement argument was waived. For purposes of this appeal, however, we shall assume, without so holding, that there was no waiver. The merits of the argument seem relatively straightforward, and it will simplify our task if we come to grips with them directly.

**A**

The Ohio statutes, as we read them, would not suggest to anyone of common intelligence that a building and loan association agent who, without authorization by the board of directors, recklessly transferred a draft belonging to the association would not have to worry about criminal liability as long as he had no intent to injure or defraud. Nothing in the portion of ORC § 1153.01 that prohibits unauthorized transfers says anything at all about a culpable mental state. The unauthorized transfer portion may not indicate a purpose to impose strict liability, but neither does it specify that there can be no offense without proof of intent to injure or defraud.

The law that applies in such a situation, as the state trial court recognized, is found in the last sentence of Ohio Rev.Code § 2901.-21(B): "When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense." The Supreme Court of the United States had occasion to quote this provision in *Osborne v. Ohio,* 495 U.S. 103, 112, n. 9, 110 S.Ct. 1691, 1699, n. 9, 109 L.Ed.2d 98 (1990), where the Court noted that "Ohio law provides that recklessness is the appropriate *mens rea* where a statute 'neither specifies culpability nor plainly indicates a purpose to impose strict liability.' "

Mr. Warner argues that he could not have been expected to foresee the state trial court's holding as to the appropriate *mens rea* because Ohio Rev.Code § 1153.01 does in fact specify culpability when it says that no agent of a building and loan association shall misapply any funds of the association "willfully." The answer to this argument, however, is the one that Mr. Warner himself suggested in the state common pleas court. Warner submitted there that § 1153.01 "plainly" encompasses two separate offenses—a willful misapplication offense specified by the portion of § 1153.01 that appears before the semicolon, and an unauthorized acts offense specified by the portion of the section that appears after the semicolon. The latter offense is "clearly" broader than the former, as Mr. Warner successfully argued in the common pleas court. It is no less clear, under the plain language of the statute, that a person can commit the unauthorized acts offense without acting willfully. As the Ohio Supreme Court put it, "there is no way to construe the second clause of the statute to impose [a 'willful' or 'purposeful' state of mind] requirement for conviction for unauthorized acts." *State v. Warner,* 564 N.E.2d at 48. And it was unauthorized acts offenses, not willful misapplication offenses, of which Mr. Warner was convicted.

It is true, to be sure, that the portion of § 1153.01 that comes before the semicolon and the portion that comes after the semicolon are both parts of the same *statutory* section. In common parlance, however, the words "section" and "portion" are used interchangeably all the time. The section of § 1153.01 appearing after the semicolon defines the only relevant offense of which Mr. Warner was convicted, and that section does not specify culpability. It was neither unreasonable nor unconstitutional, under these circumstances, for the Ohio courts to apply the word "section," as used in Ohio Rev.Code § 2901.21, to the section of Ohio Rev.Code

§ 1153.01 that defines the offense of which Mr. Warner was determined to be guilty.

**B**

■ Mr. Warner has a somewhat stronger case on the merits of the second branch of his statutory enlargement argument. This branch of the argument, it will be recalled, is that it was unforeseeable, in 1983, that a wire transfer could be equated with the transfer of a draft or other "written" instrument.[4]

■ Mr. Warner cannot prevail on this claim without persuading us that the Ohio Supreme Court's construction of Ohio Rev. Code § 1153.01 was "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," *Bouie, supra*, 378 U.S. at 354, 84 S.Ct. at 1703, or that it was impossible to ascertain that the legislature meant one thing rather than another and that the proposed interpretation would be as likely to defeat the purpose of the legislature as to promote it. See *Connally, supra*, 269 U.S. at 394, 46 S.Ct. at 128. We are not so persuaded.

The only law that had been expressed prior to the conduct in issue here was the law established in the statute itself; there were no reported decisions in point as of the time of Mr. Warner's transfers to ESM. The statute itself, as we read it, was perfectly clear in saying that a "draft" belonging to a building and loan association was not to be transferred or delivered without board authorization. The most common example of a draft is an ordinary bank check, of course, and in the experience of most of us—if not in the experience of sophisticated businessmen—bank drafts are always written instruments. The authors of Ohio Rev.Code § 1153.01 undoubtedly assumed that any

check or draft transferred or delivered in violation of the statute would be a written instrument, for otherwise they would not have used the words "other written instrument" in the catch-all phrase at the end of the laundry list that includes the word "draft."

■ It was by no means unforeseeable, however, that the Supreme Court of Ohio would conclude, as it did, that the assumption manifested by the authors of § 1153.01 was not a requirement of the statute. Read literally, Ohio Rev.Code § 1153.01 prohibits the unauthorized transfer of *any* draft belonging to a building and loan association, regardless of whether the draft happens to take the form of a written instrument. And in this day and age, when electronic transfers have become commonplace, anything other than a literal reading of the statute would be far likelier to defeat the purpose of the legislature than to promote it. As the Ohio Supreme Court explained in *State v. Warner*, 564 N.E.2d at 47,

"In today's modern banking environment, electronic transfers have become commonplace. On an average day, six hundred billion dollars in funds are transferred by wire or electronic means. This vastly exceeds the amount transferred by check.... [U]nder modern day conditions, transferring assets of a savings and loan association over the Fedwire is the equivalent of sending a check or issuing a draft.

Through R.C. § 1153.01, the General Assembly clearly intended to criminalize the unauthorized transfers of an association's assets regardless of form." (Footnote and citations omitted.)

---

**4.** Both Magistrate Judge Steinberg and District Judge Weber concluded that Mr. Warner waived this claim by failing to assert it in the state courts. Mr. Warner did file a post-verdict motion for acquittal in which he argued as a matter of state law that wire transfers do not come within the ambit of Ohio Rev.Code § 1153.01, and the state law argument was considered by all three of the Ohio courts to which the case came. Mr. Warner may or may not have made a fair presentation of the proposition that the federal Constitution prohibits the application to him of the interpretation which two of the three Ohio

courts were to place on the statute. In accepting Mr. Warner's reading of the "written instrument" language of § 1153.01, however, the Ohio Court of Appeals relied in part on the practice of "lenity." That practice is based, the court said, "upon the principle, derived from the Due Process Clause, that an individual should not be placed in the position of speculating on whether his conduct is prohibited." (*State v. Warner*, No. C–870222, Slip op. at 58–59, 1989 WL 136396 at *24.) The Ohio Court of Appeals having addressed the Due Process Clause issue, we shall do the same.

We simply cannot accept the notion that although someone in Mr. Warner's position could reasonably have understood that it would be against the law to send ESM unauthorized drafts for $12.2 million if the drafts were written on paper, he could not reasonably have understood that it would be against the law to transmit unauthorized drafts for $12.2 million if the drafts were in paperless form.[5]

## C

This is a convenient place for us to address a leitmotif in Mr. Warner's briefs that is not exactly part of his statutory enlargement argument, but that may help illuminate it.

█ Mr. Warner maintains that the real reason he was placed on trial and convicted was not that he used Home State's funds to cover the association's investments without advance approval from the board of directors. No one had ever been convicted of this crime before, Mr. Warner says, suggesting that while the transfers may have been *malum prohibitum*, they were hardly *malum in se*. The real reason for the prosecution and conviction, we are told, was that the collapse of Home State and the statewide crisis that followed the collapse produced "great public pressure to charge and convict him of something, to fix blame for the near failure of the state banking system."

There is, of course, an element of truth in this. If ESM had not been run by men who were dishonest, and if interest rate fluctuations had taken a different course in the early 1980s, Home State might not have collapsed; and if Home State had not collapsed, it is highly unlikely that Mr. Warner—a prominent businessman and former United States ambassador—would have been prosecuted for anything.

It is also true, as is evidenced by the difficulty the prosecutors had in drawing the indictment, that the charges brought against Mr. Warner under Ohio Rev.Code § 1153.01

were somewhat technical in nature. There may be an air of unreality, moreover, in the kind of analysis prescribed by the caselaw for determining whether statutes such as Ohio Rev.Code §§ 1153.01 and 2901.21(B) give a person of ordinary intelligence fair notice of what the statutes forbid. In today's world, where business people are subject to extraordinarily complex statutory rules at all levels of government, it may be doubtful whether a person in Mr. Warner's position would even have known of the existence of the statutes in question, much less spent any time cogitating about arcane distinctions between negligence and recklessness or between written instruments and paperless drafts.

This said, however, the fact remains that Home State did collapse, causing inconvenience and hardship to depositors throughout the State of Ohio. The fact remains that a jury did find, in a trial that was not fundamentally unfair, that Mr. Warner repeatedly transferred Home State drafts for millions of dollars in violation of Ohio Rev.Code § 1153.-01, thereby committing felonies of the fourth degree. And the fact remains that whatever Mr. Warner may actually have known about the statutes of which he was charged with knowledge, he undoubtedly knew, or should have known, that large Home State drafts were being transferred, first at his sufferance and then at his direction, in the context of banking practices that were obviously unsafe and unsound. The jury was instructed that it is not a crime to make bad investments, or to ignore regulatory requirements and advice in conducting the affairs of a building and loan association, but in considering whether Mr. Warner acted recklessly in making transfers without board authorization the jury was certainly not required to shut its eyes to how Mr. Warner was in fact operating.

## III

The Sixth Amendment of the United States Constitution, which has been made

---

**5.** Mr. Warner asks us to hold that because the words "moneys, funds or credits" were used in the section prohibiting willful misapplication and not in the section prohibiting unauthorized transfer, it would be unconstitutional to read the statute as prohibiting non-willful but unautho-rized transfers of moneys or funds. The argument is not persuasive. The use of the word "draft" obviated any need to speak of moneys or funds, because the transfer of a draft is the way in which the transfer of moneys or funds is normally accomplished.

applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides among other things that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation...." Was Mr. Warner adequately informed of the "nature and cause" of the accusations made against him in the Ohio common pleas court?

The original indictment, as fleshed out in July of 1986 by a bill of particulars, was nothing if not specific. Mr. Warner was told that he was accused of having made 41 unauthorized transfers to ESM. He was told the date of each transfer and the amount of money involved in each. He was told that Home State's board of directors had authorized none of the transfers. He was told that each transfer contributed to a gross overcollateralization of Home State's repurchase transactions at ESM. He was told that each transfer contravened a resolution adopted by Home State's board of directors on April 28, 1983, prohibiting overcollateralization. And he was told, of course, that each transfer violated Ohio Rev.Code § 1153.01.

■■■ If Mr. Warner had been told nothing more than this about the nature and cause of the accusations against him, he would have had little about which to complain here. Under Ohio law "[i]t is not necessary to set forth the specific degree of culpability in an indictment where the statute fails to do so and it can readily be gleaned by reference to other statutes or case law." *State v. Warner*, 564 N.E.2d at 49. The Supreme Court of the United States, similarly, has said that "[i]f the offense be a statutory one, and intent or knowledge is not made an element of it, the indictment need not charge such knowledge or intent." *United States v. Behrman*, 258 U.S. 280, 288, 42 S.Ct. 303, 304, 66 L.Ed. 619 (1922). Where there is an implied requirement of specific intent and the indictment is silent as to the mental state of the accused, the silence of the indictment on this point cannot invalidate a conviction, under federal law, as long as the jury has been properly instructed on the requisite mental state. See *United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir.), *cert. denied*, 464

U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

■■■ The circumstance which Mr. Warner seeks to turn to his advantage here, of course, is that the amended version of his indictment was *not* silent as to his mental condition. The amended indictment affirmatively alleged, with respect to each of the 41 unauthorized transfer counts, that Mr. Warner acted "with the intent to injure or defraud the Bank." If the state had been required to prove such an intent, it is entirely possible that Mr. Warner would not have been convicted on any of the unauthorized transfer counts—and by affirmatively suggesting to him that it was undertaking to prove a *mens rea* that it was not ultimately required to prove, Mr. Warner argues, the state "misled [him] into fatally undermining his own case."

Like the magistrate judge and the district judge, we are satisfied that Mr. Warner was not misled into undermining his own case. His lawyers were fully capable of reading the applicable statutes—reading them more accurately, indeed, than the prosecutors did at first—and Warner's counsel recognized from the outset that the *mens rea* specified in Ohio Rev.Code § 1153.01 for misapplication offenses did not extend to unauthorized transfer offenses. Offenses of the latter type, as Mr. Warner's counsel told the common pleas court in urging that an election be required, are clearly broader than offenses of the former type.

Mr. Warner told the magistrate judge that the motion to elect would not have been made at all if counsel had known that it would result in separate charges involving a significantly lower *mens rea*. This may be so, but it is beside the point. The object of the motion was to have the charges of unauthorized transfer dropped from the indictment altogether, leaving no charges under § 1153.01 except for charges of willful misapplication. This object was not achieved, and Warner's lawyers may have concluded, in hindsight, that the original indictment would have suited them better than the amended indictment. But as the magistrate judge pointed out, "many motions would not be filed if the moving party knew beforehand

that the outcome would be unfavorable." The failure of Mr. Warner's motion to achieve its goal hardly demonstrates prejudice.

We shall not take the time here to discuss Mr. Warner's other claims of prejudice. We have examined them carefully, and, like the magistrate judge and the district court, we find them unpersuasive.

The situation presented in this case is not one in which prejudice may be presumed. Mr. Warner had actual knowledge, before the jury was empaneled, that when a section of Ohio law defining an offense neither specifies culpability nor imposes strict liability, Ohio Rev.Code § 2901.21 says in so many words that "recklessness is sufficient culpability to commit the offense." We know that Mr. Warner had actual knowledge of § 2901.-21, because we know that the judge who was going to try his case expressly called it to his lawyers' attention. Mr. Warner's hopes may well have been buoyed by the failure of the prosecutors to embrace the judge's reading of the law sooner than they did, but the fact that the prosecutors and the trial judge ultimately proceeded under a correct interpretation of the law can hardly have come as any *surprise* to Mr. Warner, disappointing to him though it may have been.

█ There is a wealth of federal caselaw to the effect that overstatement of the pertinent *mens rea* in an indictment is "mere surplusage" that neither obligates the prosecutor to prove more than the law requires nor obligates the trial judge to misinstruct the jury. See, *e.g., United States v. Liparota,* 735 F.2d 1044, 1048 (7th Cir.1984), *rev'd. on other grounds,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), citing *United States v. Greene,* 497 F.2d 1068, 1086 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Holmes,* 594 F.2d 1167, 1173 (8th Cir.), *cert. denied,* 444 U.S. 873, 100 S.Ct. 154, 62 L.Ed.2d 100 (1979); *United States v. England,* 480 F.2d 1266, 1269 (5th Cir.), *cert. denied,* 414 U.S. 1041, 94 S.Ct. 543, 38 L.Ed.2d 332 (1973). *Cf. Nichamin v. United States,* 263 F. 880, 881 (6th Cir.1920).

A relatively recent Sixth Circuit decision is instructive here. In *United States v. Hatha-*

*way,* 798 F.2d 902 (6th Cir.1986), a federal jury found the defendant guilty of mail fraud. The indictment had charged that the defendant "well knew" that his representations were false, but when it came time for trial the government was allowed to go to the jury on a "reckless indifference" instruction. *Id.* at 910. This court held that the variance did not amount to a constructive amendment of the indictment. A constructive amendment would have been deemed prejudicial per se, but reversal was not required in the absence of such an amendment, the *Hathaway* court said, unless the defendant could show (as Mr. Hathaway could not show) "prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Id.* at 911, quoting *United States v. Miller,* 471 U.S. 130, 138 n. 5, 105 S.Ct. 1811, 1816 n. 5, 85 L.Ed.2d 99 (1985).

In the case at bar Mr. Warner has shown no prejudice to his ability to defend himself at trial. He has shown no prejudice to the general fairness of his trial, and no prejudice to the sufficiency of the indictment to bar subsequent prosecutions. He did not make any claim of prejudice at the time of trial, and as far as we can see he has no basis for requesting an evidentiary hearing on the point. The assignment of error in respect of Mr. Warner's constitutional right to be informed of the nature and cause of the accusation against him is not well taken.

## IV

### A

The defendant in a criminal trial has a constitutional right to be present at all critical stages of the trial. See *Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983). The Supreme Court of Ohio held that Mr. Warner and his co-defendants were effectively denied this right when a written version of the trial court's oral instructions was given to the jury without the defendants being allowed to inspect it. *State v. Schiebel,* 55 Ohio St.3d 71, 85, 564 N.E.2d 54, 70 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). Counsel

for the respondent does not challenge the proposition that the error was of constitutional dimension.

If the error had occurred in a federal trial court, it might be arguable—although we obviously do not decide the point—that reversal on appeal would be virtually automatic, regardless of whether the defendant could show that the error caused any significant prejudice. Mr. Warner was tried in a state court, however, and the Supreme Court of the United States has denied certiorari. The Ohio Supreme Court's reinstatement of the conviction thus represents a final judgment that is no longer subject to direct review in the Supreme Court of the United States. (The judgment would never have been subject to direct review in our court, of course.) Our only role—and the only role now left to the United States Supreme Court, should it elect to review our decision—is to determine whether the "extraordinary" remedy of habeas corpus should be granted here. See *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993).

■ The role of the federal courts in making such determinations is one that the Supreme Court has described as "secondary and limited." *Id.,* quoting *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983). "[H]abeas corpus is not intended as a substitute for appeal," *Wright v. West,* —— U.S. ——, ——, 112 S.Ct. 2482, 2490, 120 L.Ed.2d 225 (1992) (opinion of Thomas, J.), and "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

The magistrate judge concluded, in the case at bar, that the error committed by the state trial court constituted "ordinary trial error" for which habeas relief could not be granted unless Mr. Warner could sustain "the burden of establishing that the trial court's refusal to supply the parties with copies of the written jury instructions deprived him of a fair trial." The district judge, similarly, held that the error was not cognizable in federal habeas proceedings "in

the absence of clear prejudice." No such prejudice was found to have occurred.

■ We are not certain that this particular error fits squarely within the category of constitutional violations that the Supreme Court has characterized as "trial error." See *Brecht, supra,* —— U.S. at ——, 113 S.Ct. at 1717. Having read both the transcript of the oral instructions given in open court and the written version set forth in the joint appendix, however, we are satisfied that there are no prejudicial discrepancies with respect to any of the counts on which Mr. Warner was convicted. The error committed by the state trial court in not allowing counsel to see the written copy of the jury charge bears little resemblance to the kind of "structural defect"—deprivation of the right to counsel, for example—that infects the entire trial process, thereby necessitating relief automatically. See *Brecht, op. cit.*

Under these circumstances, it seems to us, the appropriate test is the one prescribed by *Brecht* and *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." A more stringent test would conflict, we believe, with the principles of federalism and comity that inform the Supreme Court's habeas corpus jurisprudence. And if we are correct in thinking that the *Brecht/Kotteakos* test is the one that applies here, we see no legitimate basis for granting Mr. Warner the relief he seeks. Warner clearly suffered no actual prejudice by reason of his failure to see the written version of the jury instructions.

**B**

As mentioned previously, the set of written instructions sent to the jury room in the first instance did not include copies of the four supplemental instructions delivered orally on the afternoon of February 20, 1987, following the in-chambers conference at which the parties presented their objections to the main body of the charge. The next morning, a Saturday, counsel discussed the omission with the trial judge in his chambers. Affidavits subsequently filed with the trial court in support of a motion to supplement the record

give the following account of what happened next.

One of Mr. Warner's attorneys handed copies of three or four instructions to a court reporter, who retyped them and gave a copy to the judge. The judge instructed a constable to deliver the instructions to the jury room. The constable did so, placing the instructions on a table during a break and telling the jurors as a group that "there were some additional jury instructions for them to consider along with the ones that were in the binder which had been given to them the afternoon before." After the jury returned its verdict, which was not until March 2, 1987, the court reporter went to the jury room to collect the exhibits. There she discovered a "chaotic" situation, with members of the press fishing through boxes and wastepaper baskets. The court reporter collected what she could, but while she was en route to the clerk's office the cart on which she was carrying the papers tipped over. When the record was finally assembled in the clerk's office, the original copies of the typed instructions were not to be found.

It was the state that filed the motion to supplement the record. Mr. Warner opposed the motion. In this connection he filed affidavits in which two of the jurors stated that they had no recollection of the constable's bringing them any additional written instructions.

The trial court granted the motion to supplement, finding as a fact that the typewritten copies of the supplemental instructions were delivered to the jury room on Saturday, February 21, 1987. The judge who granted the motion in Mr. Warner's case was not the same judge who had presided at the trial. However, the judge who had presided at the trial granted a similar motion in codefendant Schiebel's case. The latter judge likewise found as a fact that written copies of the supplemental instructions were taken to the jury room and left there by the constable. The Ohio Supreme Court accepted these findings as true, since they were supported by competent, reliable evidence and the trial court was not shown to have abused its discretion. See *State v. Schiebel,* 564 N.E.2d at 66–68.

The respondent warden argues here that the findings as to the supplemental instructions are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). As required by § 2254(d)(2), (3) and (6), we understand the respondent to say, the state court's factfinding procedures were adequate to afford a full and fair hearing, the material facts were adequately developed, and the petitioner received a full, fair and adequate hearing. See *Lundy v. Campbell,* 888 F.2d 467, 469 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990) ("complete deference [must be accorded] to evidence-supported state court findings of fact"). The respondent's argument is consistent with the conclusion of the magistrate judge, whose view it was that the federal courts must defer to the determination by the Ohio Supreme Court that the correcting of the record did not represent an abuse of discretion.

The district judge was of the opinion that Mr. Warner waived his right to raise the supplemental instruction issue in a habeas corpus proceeding "by failing to object to the trial court regarding the procedure used to provide the jury with the supplemental jury instructions and by failing to ask the trial court to present the written supplemental instructions to the jury on the record." The district court then went on to hold, after a *de novo* review, that no prejudicial error of constitutional magnitude had been demonstrated in any event.

■ We shall not pause to address the waiver issue, because our review of the materials placed before the district court persuades us that while the hearing in the common pleas court on the merits of the motion to correct the record was a hearing by affidavit only, the circumstances were such that the hearing met the criteria specified in 28 U.S.C. § 2254(d). We take it as given that if there had been an oral hearing at which Mr. Warner called members of the jury to testify, at least two jurors would have testified that they did not remember seeing any supplemental written instructions. Such testimony, however, would not directly contradict the strong showing made by the state that the supplemental instructions were in fact delivered.

The factual findings of the common pleas court must be presumed to be correct, under 28 U.S.C. § 2554(d), and we must assume, as did the Ohio Supreme Court, "that all four disputed supplemental instructions were reduced to writing and given to the jury." *State v. Schiebel*, 564 N.E.2d at 67. With this assumption, we have no hesitancy in rejecting Mr. Warner's claim of prejudice with respect to the jury instructions.

**V**

■ The Due Process Clause of the Fourteenth Amendment requires a state to prove beyond a reasonable doubt every fact necessary to constitute the offense charged. See *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). A trial court may not give a jury charge which shifts to the defendant the burden of proving a critical fact in dispute, see *Mullaney v. Wilbur*, 421 U.S. 684, 701, 95 S.Ct. 1881, 1891, 44 L.Ed.2d 508 (1975), nor may a court instruct a jury that proof of the existence of certain facts automatically establishes the element of intent where intent is an element of the charged offense. *Sandstrom v. Montana*, 442 U.S. 510, 523–24, 99 S.Ct. 2450, 2458–59, 61 L.Ed.2d 39 (1979).

■ Within constitutional limits, however, a state has discretion to determine the elements of state offenses. See *Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977). On habeas review, we are bound by state court interpretations of state criminal law except in extreme circumstances where it appears that the interpretation is an obvious subterfuge to evade consideration of a federal issue. See *Mullaney*, 421 U.S. at 690–91 and n. 11, 95 S.Ct. at 1885–86 and n. 11.

■ Ohio Revised Code § 1707.29—the statute under which the jury was instructed that Mr. Warner should be deemed to have knowledge of any fact of which he should have secured knowledge in the exercise of reasonable diligence—has a heading that reads "Presumption of Knowledge." Such headings, however, do not constitute any part of Ohio law. Resort to a title in construing a

statute is unnecessary and improper. See Ohio Rev.Code § 1.01.

■ Prior to the Ohio Supreme Court's decision in the instant case, one Ohio Court of Appeals had held that § 1707.29 does not create a presumption. See *State v. Walsh*, 66 Ohio App.2d 85, 94, 20 O.O.3d 178, 184, 420 N.E.2d 1013, 1020 (Franklin 1979). The Supreme Court reached the same conclusion, holding in the instant case that § 1707.29 merely sets forth what the term "knowledge" encompasses for purposes of criminal liability. See *State v. Warner*, 55 Ohio St.3d at 57, 564 N.E.2d at 42. This interpretation is entitled to deference. See *Estelle v. McGuire*, — U.S. —, —, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).

Giving due deference to the Ohio Supreme Court's reading of Ohio Rev.Code § 1707.-29—a reading that is by no means an obvious subterfuge for evading the Constitution—we conclude that § 1707.29 is nothing more than a definitional provision setting forth Ohio's standard of reasonable diligence for securities fraud cases. The instruction given by the trial court on the basis of the statute was thus entirely proper.

The judgment of the district court is **AFFIRMED.**

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

Even in a case as heavily ladened with community emotion as this one, my sworn judicial duty to accord equal rights to the rich as well as the poor remains. Residing within that obligation is the commandment to be vigilant to ensure that the constitutional rights of this defendant have not wittingly or unwittingly, directly or indirectly, been transgressed.

I am strongly persuaded that a constitutional transgression has occurred here. Therefore, I dissent from that part of the majority opinion.

It is quite clear to me that the Ohio Supreme Court's *post facto* pronouncement that wire transfers are covered under Section 1153.01 of the Ohio Revised Code Annotated

(Baldwin 1988),[1] transgressed the constitutional right of Warner to be provided with fair warning that his actions were criminal. Moreover, the retroactive application of the statute, as was done here, I am convinced, also deprives the defendant of his constitutional right to be fairly warned.

Fundamental to our concept of constitutional liberty is the unwavering ideal that a person has the immutable right to fair warning of the conduct which will permit the imposition of criminal sanctions. *Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697, 1700–01, 12 L.Ed.2d 894 (1964) (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954)). "[T]hat right is protected against judicial action by the Due Process Clause." *Marks,* 430 U.S. at 192, 97 S.Ct. at 993. In this context, the Supreme Court has stated:

> [A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one "that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action," or "that *aggravates* a *crime,* or makes it *greater* than it was, when committed." If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction. The fundamental principle that "the required criminal law must have existed when the conduct in issue occurred," must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures.

*Bouie,* 378 U.S. at 353–54, 84 S.Ct. at 1702–03 (emphasis in original) (citations omitted).

1. Section 1153.01 provides:
 No president, director, trustee, committee member, secretary, treasurer, attorney, or other officer or agent of a building and loan association shall embezzle, abstract, or willfully misapply any of the moneys, funds, or credits of the association; nor shall he issue or put

## I.

Warner moved for a judgment of acquittal after the jury returned its verdicts finding him guilty on six counts of unauthorized acts, in violation of Section 1153.01. He insisted that the wire transfers of funds from Home State to ESM, which were electronic transfers accomplished by computer impulse via the Federal Reserve Board's wire transfer system, did not constitute the assignment, transfer or delivery of a note, bond, draft or other written instrument as was charged in the indictment. The state responded, arguing that the wire transfers were the functional equivalent of a check or draft. Alternatively, the state, after being allowed to amend Warner's indictment post-trial to fit its alternative argument, contended that a wire transfer is an order. The trial court denied Warner's motion for judgment of acquittal.

Upon review, the Ohio Court of Appeals found Warner's argument to be meritorious. *State v. Warner,* No. C–870222, 1989 WL 136396, at *25 (Ohio Ct.App. Nov. 15, 1989), *rev'd,* 55 Ohio St.3d 31, 564 N.E.2d 18 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). The court found that the state's belated attempt to amend the indictment was improper. Therefore, the court confined its "consideration to the question of whether a wire transfer constitutes an 'assign[ment], transfer or deliver[y] of a note, bond, draft or other written instrument.'" *Id.* at *23.

Referencing civil cases from other jurisdictions, the court concluded that there is compelling authority for finding either that wire transfers are the functional equivalent of a check or that the "construction of the term 'draft,' as it is used in R.C. 1153.01, to encompass funds conveyed by computer impulse would amount to judicial legislation by extending the language of the applicable pro-

into circulation a warrant or other order, or assign, transfer, cancel, or deliver a note, bond, draft, mortgage, judgment, decree, or other written instrument belonging to the association, or raise or receive money for and in the name of such association, unless authorized to do so by its board of directors.

vision beyond the intent of the legislature." *Id.* Relying on rules of statutory construction and focusing on the compelling authority favoring Warner's view, the court held that the relevant statutory phrase required that the violative instrument be in writing. Because the wire transfers were effectuated by computer impulse rather than by written instrument, the state appeals court concluded that there was insufficient evidence to convict Warner of the charges in the indictment.

The Ohio Supreme Court reversed. *Warner,* 564 N.E.2d 18. The court noted that wire transfers are commonplace and that there is a body of law which treats wire transfers as a writing and/or as "the equivalent of sending a check or issuing a draft." *Id.* at 47. The court found that the rule of *ejusdem generis*[2] should not be invoked to defeat the obvious purpose of a legislative enactment. The court concluded:

> Through R.C. 1153.01, the General Assembly clearly intended to criminalize the unauthorized transfers of an association's assets regardless of form. Thus, the transfer of funds through the Fedwire system qualifies as a "draft" or other "written instrument" as those terms are used in R.C. 1153.01. Accordingly, the court of appeals' conclusion that the unauthorized transfer of Home State's assets over the Fedwire did not constitute a "writing" within the meaning of R.C. 1153.01 was erroneous.

*Id.*

## II.

"Our system of justice is based on the principle that criminal statutes shall be couched in language sufficiently clear to apprise people of the precise conduct that is prohibited." *United States v. Alpers,* 338 U.S. 680, 685, 70 S.Ct. 352, 355, 94 L.Ed. 457

(1950) (Black, J., dissenting); *see also Harriss,* 347 U.S. at 617, 74 S.Ct. at 812 ("The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.") (footnote omitted).

As a result, criminal statutes are strictly construed. *See, e.g., Alpers,* 338 U.S. at 681, 70 S.Ct. at 353, *United States v. Jeter,* 775 F.2d 670, 676 (6th Cir.1985) (quoting *United States v. Essex,* 407 F.2d 214, 218 (6th Cir. 1969)), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986); *United States v. Waechter,* 771 F.2d 974, 978 (6th Cir.1985). "This means that no offense may be created except by the words of [the legislature] used in their usual and ordinary sense. There are no constructive offenses." *Alpers,* 338 U.S. at 681, 70 S.Ct. at 353. I recognize, however, that " '[t]he canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose.... Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.' " *United States v. Moore,* 423 U.S. 122, 145, 96 S.Ct. 335, 347, 46 L.Ed.2d 333 (1975) (quoting *United States v. Brown,* 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948)).

The present language of Section 1153.01 does not disclose that wire transfers are included in the term "draft" or the phrase "other written instrument." As a result, it seems to me unforeseeable that the statute would be construed in the manner that it was by the Ohio Supreme Court.[3]

---

2. The rule of *ejusdem generis* is a canon of statutory construction which limits general terms which follow specific ones to matters similar to those specified. *See United States v. Alpers,* 338 U.S. 680, 682–83, 70 S.Ct. 352, 354, 94 L.Ed. 457 (1950) (quoting *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936)); *United States v. Jeter,* 775 F.2d 670, 676 n. 4 (6th Cir.1985) (quoting *Black's Law Dictionary* 464 (5th ed.1979)), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986).

3. I do not suggest that a court of a state is prevented from construing its own statutory laws. The Ohio Supreme Court certainly has that right. Moreover, we are bound by that state court's interpretation. *See, e.g., Lovely v. Cunningham,* 796 F.2d 1, 5 n. 4 (1st Cir.1986); *Gilbert v. Parke,* 763 F.2d 821, 826 (6th Cir.1985). However, while the Ohio Supreme Court could, as is its right, construe Section 1153.01 to include wire transfers, it cannot apply that con-

My reading of Section 1153.01 leads me to the conclusion that it is a narrow and precise statute that plainly and clearly indicates that the lawmakers intended to criminalize *written* transfers of funds, be it through drafts or other written instruments. This conclusion results from the usual and ordinary usage of the words "draft" and "other written instrument," as used in this context.

The term "draft" connotes something written. While the majority implies that a "draft" could mean something other than a written document, the ordinary usage of the term, as used in this context, refers to a written document. A "draft," as defined by *Black's Law Dictionary* 258 (5th ed. abr. 1983), is "[a] *written* order by the first party, called the drawer, instructing a second party, called the drawee (such as a bank), to pay a third party, called the payee." (Emphasis added.) *See also* Ohio Rev.Code Ann. § 1303.03 (Baldwin 1988) (as used in a chapter of its Commercial Transactions statutes, a "draft" is a *writing* which complies with the requirements of being a negotiable instrument). The majority acknowledges that the fundamental nature of a draft includes it being written by stating that "[t]he most common example of a draft is an ordinary bank check, of course, and in the experience of most of us—if not in the experience of sophisticated businessmen—*bank drafts are always written instruments." Warner v. Zent,* 997 F.2d 116, 127 (6th Cir.1993) (emphasis added).[4]

Given the plain, restrictive statutory language, a person transferring funds by wire or computer impulse (or perhaps orally) would not have been able to foresee that his/her act was criminal *prior* to the ruling by Ohio's highest court. This unforeseeability is magnified in this type of case because the statute, on its face, is narrow and precise as opposed to merely being vague. Rather than using general, more expansive and inclusive terms, the statute sets out specific types of written instruments which, if used in an unauthorized manner, would violate it.

As the Supreme Court discussed when confronted with a narrow and precise statute that a state supreme court judicially expanded:

> When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction. If the Fourteenth Amendment is violated when a person is required "to speculate as to the meaning of penal statutes," ... or to "guess at [the statute's] meaning and differ as to its application," ... the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question.

*Bouie,* 378 U.S. at 352, 84 S.Ct. at 1702.

Furthermore, when a statute is clear on its face, a citizen—whether a sophisticated businessman or not—should not have to canvass its legislative history and/or judicial pronouncements to determine whether his/her conduct is condemned. *Cf. McSherry v. Block,* 880 F.2d 1049, 1061 (9th Cir.1989) (Canby, J., dissenting) (When the words of the statute are clear, "[c]itizens should not be required, on pain of criminal conviction, to explore legislative and judicial history to determine whether that history condemns their conduct even though the statute itself does not."), *cert. denied,* —— U.S. ——, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991); *accord Dunn v. United States,* 442 U.S. 100, 112–13, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979) (quoting *United States v. Gradwell,* 243 U.S. 476,

---

struction to Warner if that construction was so unforeseeable as to deprive Warner of the fair warning to which the Due Process Clause of the Constitution entitles him. *See Bouie,* 378 U.S. at 353–54, 362, 84 S.Ct. at 1702–03, 1707.

4. Obviously, the phrase "other written instrument" refers to a written instrument.

485, 37 S.Ct. 407, 411, 61 L.Ed. 857 (1917)) ("[T]o ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not ' "plainly and unmistakably" ' proscribed."). Because the language of Section 1153.01 is so clear, Warner, in my view, was not given fair warning that his actions would be deemed to violate Section 1153.01. We cannot hold the defendant—under this criminal statute—to a higher or lesser standard than any other citizen. As the first Justice John Marshall Harlan wrote in 1896 in *Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting), *overruled by Brown v. Board of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), in a different context, the constitution does not distinguish between citizens on the basis of caste or class.

Even if it could be contended that there is some uncertainty about what Section 1153.01 states, with the assistance of general principles of statutory construction, it is clear to me that Section 1153.01 only referred to written instruments prior to the Ohio Supreme Court's pronouncement in Warner's case.

Through the principle of *noscitur a sociis* [5], Section 1153.01 can be construed to apply to only written instruments. As the Ohio Court of Appeals found, "with respect to the provision of the unauthorized acts portion of R.C. 1153.03 [sic] under which Warner was charged[,] [ ] the legislature's use of the catch-all phrase 'other written instruments' imposed upon the other instruments within the category, i.e., a 'note,' 'bond' or 'draft,' a requirement that they be in writing." *Warner,* 1989 WL 136396, at *24. Even the majority concedes that "[t]he authors of Ohio Rev.Code § 1153.01 *undoubtedly assumed* that any check or draft transferred or delivered in violation of the statute would be a written instrument, for otherwise they would not have used the words 'other written instrument' in the catch-all phrase at the end of the laundry list that includes the word

'draft.' " *Warner,* 997 F.2d at 127 (emphasis added). Assumptions are inappropriate elements of criminal statutory construction.

Furthermore, according to another general rule of statutory construction, *expressio unius est exclusio alterius,* the specific mention of one thing in a statute implies an intent on the part of the legislature to exclude another. *See, e.g., United States v. Silverman,* 976 F.2d 1502, 1522 (6th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1595, 123 L.Ed.2d 159 (1993); *McCammon v. Indiana Dep't of Fin. Insts.,* 973 F.2d 1348, 1350 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1282, 122 L.Ed.2d 675 (1993). Pursuant to that rule, the specific mention of the terms "draft" and "other written instrument" implies an intent on the part of the lawmakers to exclude other modes of transfers like wire or computer transfers. As the Ohio Court of Appeals stated: "The failure of the legislature specifically to proscribe unauthorized transfers of funds by computer impulse might imply an intent on their part to exclude such transfers; however, it might also suggest that the present ubiquity of transfers by computer impulse was not within the contemplation of the legislature when the statute was enacted." *Warner,* 1989 WL 136396, at *24.

Notwithstanding the plain import of Section 1153.01, the majority seems to imply that because wire transfers have become commonplace, a person in the position of Warner reasonably could be expected to know that wire transfers would be treated as the equivalent as checks and drafts, and as a result, the wire transfers Warner made would also violate Section 1153.01. While it is true that wire transfers have become commonplace, I am uncertain where that fact leads me. One could argue that such common usage should have prompted the Ohio Legislature to include same by amending the statute. Certainly the majority cannot be arguing that the mere frequent use of wire transfers, in and of itself, make it foreseeable that those transfers would be deemed illegal.

---

**5.** The principle of *noscitur a sociis* (one may be known by the company that one keeps), "acknowledges that general and specific words are associated with and take color from each other,

restricting general words to a sense analogous less general." *Owen of Georgia, Inc. v. Shelby County,* 648 F.2d 1084, 1092 (6th Cir.1981).

It seems illogical to me to conclude that merely because wire transfers are commonplace, a broader interpretation of "draft" could be foreseeable or that a more narrow reading of the term would defeat the purpose of the legislature rather than promote it.

In addition, while wire transfers are widespread, the law governing those type of transfers was and is anything but clear. Certainly, in the civil context, there is some authority for the proposition that a transfer of funds by computer impulse may be held to be the functional equivalent of a check. *See Warner,* 564 N.E.2d at 45–47 (authorities noted). As the Ohio Court of Appeals noted, however, "[t]here exists ... equally compelling authority for Warner's position that construction of the term 'draft,' as it is used in R.C. 1153.01, to encompass funds conveyed by computer impulse would amount to judicial legislation by extending the language of the applicable provision beyond the intent of the legislature." *Warner,* 1989 WL 136396, at *23 (authorities noted). Many courts have decided that wire/electronic transfers were not in the contemplation of the drafters of Article 4 of the Uniform Commercial Code ("U.C.C.") and have determined that the U.C.C. does not and should not deal with those type of transfers. *See id.; Evra Corp. v. Swiss Bank Corp.,* 673 F.2d 951, 955 (7th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982); *Shawmut Worcester County Bank v. First Am. Bank & Trust,* 731 F.Supp. 57, 62 (D.Mass.1990); *Mellon Bank v. Securities Settlement Corp.,* 710 F.Supp. 991, 993 (D.N.J.1989). Arguably, the same could have been true with the Ohio legislature's thinking in formulating Section 1153.01.

Furthermore, by quoting from the Official Code Comment to U.C.C. § 4A–102 (Anderson Supp.1992),[6] the Ohio Supreme Court recognized the need for further legislation to deal with the current banking practices in the civil context. It stated: "We recommend that the General Assembly consider legislation such as UCC 4A–102 in light of today's modern banking environment and in order to avoid sometimes strained interpretations of Ohio UCC Article IV." *Warner,* 564 N.E.2d at 47 n. 21. The same recognition that modern banking practices, including wire transfers, require further explicit legislation would seem to hold true in the criminal context, if not more so, given the loss of personal liberty aspect of criminal justice. In any event, this Court's majority ought not—and I shall not—countenance a construction of a statute that amounts to engrafting an amendment upon it. Only by such an amendment can this conviction under Section 1153.01 be held to not violate the defendant's constitutional right.

Finally, nothing has prevented the Ohio legislature from proscribing, by amendment, that activity directly and explicitly. In fact, the common nature of this type of transfer is all the more reason to expect the legislature to act explicitly. Although due process does not require impossible standards of clarity, further precision, given the commonplace nature of wire transfers, is neither impossible nor impractical. *Cf. Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983) (Court found statute to be unconstitutionally vague on its face within the meaning of the due process clause because it did not clarify certain terms).

### III.

Given that Section 1153.01 is clear and precise, that such a statute is juxtaposed against rapidly evolving banking practices, and that citizens should not have to rely on

---

**6.** The Official Code Comment to U.C.C. § 4A–102 reads, in pertinent part:

The funds transfer governed by Article 4A is in large part a product of recent and developing technological changes. Before this Article was drafted there was no comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform.

Judges have had to resolve disputes by referring to general principles of common law or equity, or they have sought guidance in statutes such as Article 4 which are applicable to other payment methods. But attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory.

clear criminal statutes at the risk of their own personal peril, I must part company with the majority in its conclusion that Warner had fair warning that his actions violated Section 1153.01. While I dissent from Section II.B. of the majority opinion, I do, however, concur in the rest of it.